# UNITED STATES *v.* MAINE ET AL. (RHODE ISLAND AND NEW YORK BOUNDARY CASE)

No. 35, Orig.   Argued November 26, 1984—Decided February 19, 1985

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht,* and *Margaret N. Strand.*

*John G. Proudfit,* Assistant Attorney General, argued the cause for defendant State of New York. With him on the briefs were *Robert Abrams,* Attorney General, and *Peter H. Schiff.*

*J. Peter Doherty,* Special Assistant Attorney General, argued the cause for defendant State of Rhode Island. With him on the briefs was *Dennis J. Roberts II,* Attorney General.*

JUSTICE BLACKMUN delivered the opinion of the Court.

These supplemental proceedings in this wide-ranging litigation are to determine the legal coastline of the United States in the area of Block Island Sound and the eastern portion of Long Island Sound. That determination turns on whether Long Island Sound and Block Island Sound constitute, in whole or in part, a juridical bay under the provisions of the Convention on the Territorial Sea and the Contiguous Zone (the Convention).[1] To the extent the Sounds constitute a juridical bay, the waters of that bay, under the Con-

---

*Norman C. Gorsuch,* Attorney General, *G. Thomas Koester,* Assistant Attorney General, *John Briscoe,* and *David Ivester* filed a brief for the State of Alaska as *amicus curiae.*

[1] [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639. See *United States* v. *Louisiana (Louisiana Boundary Case),* 394 U. S. 11, 16, n. 7 (1969).

vention, are then internal waters subject to the jurisdiction of the adjacent States, and the line that closes the bay is coastline for the purpose of fixing the seaward boundaries of the States.

The Special Master concluded (a) that the Sounds in part do constitute a juridical bay, and (b) that the bay closes at the line drawn from Montauk Point, at the eastern tip of Long Island, to Watch Hill Point on the Rhode Island shore. We have independently reviewed the voluminous record, as we must, see *Mississippi* v. *Arkansas*, 415 U. S. 289, 291–292, 294 (1974); *Colorado* v. *New Mexico*, 467 U. S. 310, 317 (1984), and find ourselves in agreement with the Special Master. We therefore adopt the Master's findings, confirm his conclusions, and overrule the respective exceptions filed by the United States, the State of New York, and the State of Rhode Island and Providence Plantations.

## I

This action, invoking the Court's original jurisdiction under U. S. Const., Art. III, § 2, and 28 U. S. C. § 1251(b)(2), was instituted in 1969, see 395 U. S. 955, with the filing of a complaint by the United States against the 13 States that border the Atlantic Ocean.[2] The purpose of the suit was to determine whether the United States had exclusive rights to the seabed and subsoil underlying the ocean beyond three geographical miles from each State's coastline. See Submerged Lands Act of 1953, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.* In due course, after the filing of answers, the appointment of a Special Master, 398 U. S. 947 (1970), the submission of the Master's Report, the filing of exceptions thereto, and oral argument,[3] this Court delivered its opinion,

[2] The State of Connecticut was not named as a defendant. This apparently was because the State borders only on a part of Long Island Sound deemed to be inland waters, rather than open sea. See *United States* v. *Maine*, 420 U. S. 515, 517, n. 1 (1975).

[3] See also 400 U. S. 914 (1970); 403 U. S. 949 (1971); 404 U. S. 954 (1971); 408 U. S. 917 (1972); 412 U. S. 936 (1973); 419 U. S. 814 (1974); 419 U. S.

420 U. S. 515 (1975), and entered a general decree, 423 U. S. 1 (1975). The Court there determined that the States held interests in the seabeds only to a distance of three geographical miles from their respective coastlines. The Court did not then fix the precise coastline of any of the defendant States; instead, jurisdiction was reserved "to entertain such further proceedings, including proceedings to determine the coastline of any defendant State, to enter such orders, and to issue such writs as may from time to time be deemed necessary or advisable to give proper force and effect to this decree." *Id.*, at 2.[4]

Meanwhile, in an unrelated federal action, pilots licensed by Connecticut challenged a Rhode Island statute which requires every foreign vessel and every American vessel under register for foreign trade that traverses Block Island Sound to take on a pilot licensed by the Rhode Island Pilotage Commission. The District Court in that suit ruled that Rhode Island possessed the authority so to regulate pilotage in the Sound. Its theory was that the State had that authority under 46 U. S. C. § 211, a statute which gives the States power to regulate pilots in "bays, inlets, rivers, harbors, and ports of the United States." In so ruling, the court determined that Block Island Sound was a bay under the Convention and therefore qualified as internal waters within Rhode Island's coastline. *Warner* v. *Replinger*, 397 F. Supp. 350, 355–356 (RI 1975). The United States Court of Appeals for the First Circuit affirmed that judgment. *Warner* v. *Dunlap*, 532 F. 2d 767 (1976), cert. pending *sub nom. Ball* v. *Dunlap*, No. 75–6990.

In December 1976, obviously in response to the ruling in the Rhode Island Pilotage Commission suit, and apparently

---

1087 (1974); 419 U. S. 1102 (1975); 420 U. S. 904 (1975); and 420 U. S. 918 (1975).

[4] Subsequently, the coastline of the Commonwealth of Massachusetts was determined in part by a supplemental decree issued by this Court. See *United States* v. *Maine (Massachusetts Boundary Case)*, 452 U. S. 429 (1981).

in the thought that coastline determinations would best be made in this then-existing original action, the United States filed a motion for supplemental proceedings to determine the exact legal coastlines of Massachusetts and Rhode Island. This Court entered an order appointing the Honorable Walter E. Hoffman as Special Master, with the customary authority to request further pleadings, to summon witnesses, to take evidence, and to submit such reports as he might deem appropriate. 433 U. S. 917 (1977). The Massachusetts component of the litigation was separated from the Rhode Island component when it became clear that each concerned different issues. See n. 4, *supra*. Subsequently, the Master granted New York's motion to participate in the Rhode Island proceedings.

The basic position of the United States is set forth in the following allegations of its second amended complaint:

> "The coastline of Rhode Island is the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.
>
> .       .       .       .       .
>
> ". . . [T]he coast of the the State of Rhode Island, except as to Block Island, is the ordinary low water line along the mainland beginning at the Massachusetts border to a point off Sakonnet Point, then a straight closing line across Narragansett Bay to Point Judith, then the ordinary low water line along the mainland to the Connecticut border. As to Block Island, the coast of the State of Rhode Island is the ordinary low water line around Block Island. . . ."

Rhode Island's basic position is asserted in its counterclaim:

> "[T]he Rhode Island coast is the ordinary low water line along the mainland beginning at the Massachusetts border to a point off Sakonnet Point, then a straight closing

line from Sakonnet Point west to Point Judith, then a straight closing line south to Sandy Point on Block Island, then the ordinary low water line along the Block Island shore clockwise, to a point along a straight closing line to Montauk Point on Long Island, State of New York."

The status of Long Island Sound as internal waters over which the States have jurisdiction is no longer at issue, for the parties agree, as the Master had found, that Long Island Sound is a historic bay under Article 7(6) of the Convention. We, too, agree with that determination. Its waters therefore are internal waters regardless of whether it also is in part a juridical bay.[5]

In his Report, the Special Master concluded that Long Island Sound and Block Island Sound constitute a juridical bay under the Convention, especially as interpreted by this Court's decision in *United States* v. *Louisiana (Louisiana Boundary Case)*, 394 U. S. 11 (1969). The Master so found after concluding that Long Island is to be viewed as an extension of the mainland and as constituting the southern headland of the bay. The Master went on to conclude, as noted above, that the bay closes at the line drawn from Montauk Point, at the eastern tip of Long Island, to Watch Hill Point on the Rhode Island shore.

The Special Master's Report, when received here, was ordered filed, and exceptions thereto, and replies, were authorized. 465 U. S. 1018 (1984). In response, the United States, the State of Rhode Island, and the State of New York each filed exceptions. These were set for oral argument. 468 U. S. 1213 (1984). The case is now before us on the

---

[5] New York and Rhode Island initially asserted that Block Island Sound also constituted a historic bay under the Convention. The Master found that Block Island Sound was not a historic bay. Report 8–19, 61. No exception has been filed to that part of the Master's Report.

Report, the exceptions, and the briefs and arguments of the parties.

## II

In this Court, the United States argues that it "quarrel[s] only with the Special Master's recommendation that Long Island be deemed a part of the mainland and the consequences that necessarily flow from that ruling." Exception of United States 5. It states that if Long Island is considered an island, rather than an extension of the mainland, it cannot form a juridical bay. It expresses concern about "the principle involved and the precedent created," *id.*, at 6, if its not-part-of-the-mainland argument is rejected, because of the effect of that decision on other States and its international implications. The United States argues that current social and economic ties between Long Island and the mainland cannot overcome the geographical separateness of the Island. It states that any emphasis on the "bay-like" appearance and usage of the waters sheltered by Long Island is "reasoning backwards." *Id.*, at 8. The Court should affirm, or really reaffirm, that a "geographical island is an island in the eye of the law except only in very rare and truly unusual circumstances." *Id.*, at 9. It finds support in *Louisiana* v. *Mississippi,* 202 U. S. 1 (1906), and in the *Louisiana Boundary Case, supra,* and it points out that Long Island Sound indeed has been referred to, even by this Court, as "an insular formation." See 394 U. S., at 72, n. 95.

Before this Court, Rhode Island has directed its exceptions to the fixing of a line that closes what it claims is a juridical bay consisting of Long Island Sound and Block Island Sound. Although it agrees with the other parties that Montauk Point is the bay's southern headland, Rhode Island argues that Watch Hill Point cannot be the northern headland, if for no other reason than that a point east of Watch Hill Point (near Quonochontaug Pond) is a preferred choice, for it, too, would satisfy all required conditions and would enclose more water area. But Rhode Island further notes that Block Island lies

at the opening of the long and deep indentation formed by the two Sounds. It is said that although Block Island lies seaward of a direct line from Montauk Point to Point Judith, it nevertheless influences Block Island Sound in a number of significant ways: coastal traffic routinely passes outside Block Island; commercial vessels rarely go between Montauk Point and Block Island because of the hazardous underwater conditions there; Block Island provides shelter in rough weather; the salinity of the water in Block Island Sound is less than that of water of the open sea; the island has an effect upon the currents of Block Island Sound; and these factors together link Block Island to the indentation rather than to the open sea.

New York, in its turn, argues here that the applicable criteria for determining the existence of a bay apply also to the portion of Block Island Sound east of the line between Montauk Point and Watch Hill Point. The passage between Block Island and Point Judith is the primary entrance to the indentation formed by the two Sounds. This places the northern headland at Point Judith. The shallow depth and underwater obstacles between Montauk Point and Block Island have an effect on the surface of the water in storm conditions, for they are part of the terminal moraine that formed Long Island. The waters of the Sound are sheltered by Block Island and the underwater obstructions. Commercial ships use the entrance to Block Island Sound which lies between Block Island and Point Judith. Thus, the artificial line between Montauk Point and Watch Hill Point in reality would not divide waters having the characteristics of a bay from those having the characteristics of the open sea. The waters of Block Island Sound do not constitute a route of international passage. They are closely related to the mainland by the intensity of their use for fishing and recreational boating. It is clear from the evidence, it is said, that the purposes and characteristics of a bay that are found in Long Island Sound are present, too, in Block Island Sound. Those

waters are also landlocked, for they satisfy the objective test described by Rhode Island's witness Jeremy C. E. White (land visible for at least 180 degrees upon entrance to a bay). The Rhode Island coast to the north provides closure and protection, and Block Island provides additional closure and protection sufficient for the waters of the Sound to be landlocked. Thus, New York says, the Master should have utilized Block Island in closing the Bay.

In its reply brief, the United States notes that if it prevails against the mainland-extension argument, the case is at an end. In the light of the possibility that it might not prevail in that argument, the United States turns to the closing line issue. Accepting, *arguendo*, "that Long Island, juridically, is a peninsula," Reply Brief for United States 2, the Government endorses the Special Master's resolution, namely, that the bay is closed by the line from Montauk Point to Watch Hill Point. Satisfaction of the semicircle and the 24-mile tests is not enough. Under the Convention, a well-marked indentation which is more than a mere curvature of the coast and the presence of landlocked waters are requirements that also must be satisfied. The natural companion for Montauk Point is Watch Hill Point, almost due north, and not Point Judith, 18 miles to the east. Watch Hill Point is the nearest point on the opposite shore. It was recognized and approved as a closing point by at least two expert witnesses. It is the first prominent point on the Rhode Island coast. The bay thus closed is surrounded by land on all sides but one, and it provides useful shelter and isolation from the sea. The enclosed waters clearly are landlocked. This cannot be said of the waters east of the line, which are open on two sides, unless one assumes a closure because of underwater conditions between Montauk Point and Block Island.

### III

Under § 4 of the Submerged Lands Act, 43 U. S. C. § 1312, a coastal State's boundary is measured from its legal coastline. The coastline is defined as "the line of ordinary low

water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." § 1301(c). A State's seaward boundary generally is set as a line three geographical miles distant from its coastline. § 1312. Waters landward of the coastline therefore are internal waters of the State, while waters up to three miles seaward of the coastline are also within a State's boundary as part of the 3-mile ring referred to as the marginal sea.[6] This Court previously has observed that Congress by the Submerged Lands Act left to the Court the task of defining the boundaries of the States' internal waters, and the Court under that Act has adopted the definitions contained in the Convention in determining the line marking the seaward limit of inland waters of the States. See *Louisiana Boundary Case*, 394 U. S., at 16, 35; *United States* v. *California*, 381 U. S. 139, 165–167 (1965).[7]

Article 7 of the Convention establishes special criteria for drawing the baseline of a juridical bay. Article 7(2) defines a juridical bay:

---

[6] Under § 3(a) of the Submerged Lands Act the States have title to and ownership of the lands beneath navigable waters within their boundaries. 43 U. S. C. § 1311(a). The location of a State's boundary also may be relevant in determining the State's right to regulate navigation. Congress, of course, has the right under the Commerce Clause to regulate all navigation, but, since the time of the First Congress, it has given the States the right to regulate pilotage "in the bays, inlets, rivers, harbors, and ports of the United States." Act of Aug. 7, 1789, § 4, 1 Stat. 54, 46 U. S. C. § 211.

[7] The Convention and the Submerged Lands Act adopt similar approaches for establishing boundaries to jurisdiction over the sea. The Convention refers to the coastline as the "baseline," and, as in the Submerged Lands Act, it defines the baseline as the low-water line along the portion of the coast which is in direct contact with the open sea, and the line marking the seaward limit of inland waters. See Articles 3 and 7(3). Article 7(4) states that waters in a juridical bay are a nation's internal waters; this is consonant with the Act's definition of "coast line" as the line marking the seaward limit of inland waters. Much as in the Act a State's boundary is set by a 3-mile ring around the coastline, a nation-state's boundary under the Convention extends beyond the baseline. The Convention refers to this ring as the "territorial sea." Articles 3 and 5.

"For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation."

Article 7(4) states that waters in a bay with a mouth that does not exceed 24 miles are internal waters. As has been indicated, in the United States such waters are within the jurisdiction of the adjacent States pursuant to the Submerged Lands Act. If a body of water is found to be a juridical bay, then, the closing line of the bay becomes part of the coastline, and a State's boundary generally extends three miles beyond that closing line.

## IV

Addressing first the question whether Long Island Sound and Block Island Sound together constitute a juridical bay, we repeat the Convention's criteria for determining whether such a bay exists: There must be a "well-marked indentation" into the coast and it must "constitute more than a mere curvature of the coast." The indentation must enclose an area "as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of the indentation." The indentation must "contain landlocked waters." And the mouth of a bay must not exceed 24 miles.

A mere glance at a map of the region under consideration reveals that unless Long Island is considered to be part of the mainland and provides one of the headlands, neither Long Island Sound nor Block Island Sound satisfies Article 7's requirements for a bay. Though the coast to the north of Long Island curves somewhat, it was the nearly unanimous conclusion of the testifying experts that, in the absence of

Long Island, the curvature of the coast is no more than a "mere curvature" and is not an "indentation." And, absent Long Island, the waters of the Sounds would not be sufficiently surrounded by land so as to be landlocked; neither would they satisfy the semicircle test.

On the other hand, if Long Island is to be viewed as a continuation or part of the mainland, it is evident that a bay is formed and that the requirements of Article 7 are satisfied. All the expert witnesses reached this conclusion. The surface area of the water enclosed by the deep indentation is substantially larger than the area of a semicircle whose diameter is that of the line across the mouth of the indentation, regardless of where that mouth is located. The question whether Long Island Sound and Block Island Sound constitute a juridical bay therefore depends entirely upon whether Long Island may be treated as an extension of the mainland for the application of Article 7.

There is nothing in the Convention or in the Submerged Lands Act that indicates whether islands may or may not be treated as extensions of the mainland for the purpose of forming a headland of a juridical bay.[8] This Court, however, previously has held that in some circumstances islands under Article 7 may be treated as headlands of a juridical bay.

In the *Louisiana Boundary Case*, 394 U. S., at 60–66, the Court held that small islands off the coast of Louisiana in the Mississippi River Delta constitute headlands of bays on that coast, because the shoreline there consists of a number of small deltaic islands. On the other hand, the Court determined that "Article 7 does not encompass bays formed in part by islands which cannot realistically be considered part of the mainland." *Id.*, at 67. The Court reasoned as follows:

---

[8] The Convention addresses the problems created by islands located at the mouth of a bay, see Article 7(3), but does not address the analytically different problem whether islands may be treated as part of the mainland to form an indentation.

"No language in Article 7 or elsewhere positively excludes all islands from the meaning of the 'natural entrance points' to a bay. Waters within an indentation which are 'landlocked' despite the bay's wide entrance surely would not lose that characteristic on account of an additional narrow opening to the sea. That the area of a bay is delimited by the 'low-water mark around the shore' does not necessarily mean that the low-water mark must be continuous.

"Moreover, there is nothing in the history of the Convention or of the international law of bays which establishes that a piece of land which is technically an island can never be the headland of a bay. Of course, the general understanding has been—and under the Convention certainly remains—that bays are indentions in the *mainland*, and that islands off the shore are not headlands but at the most create multiple mouths to the bay. In most instances and on most coasts it is no doubt true that islands would play only that restricted role in the delimitation of bays. . . .

.    .    .    .    .

". . . While there is little objective guidance on this question to be found in international law, the question whether a particular island is to be treated as part of the mainland would depend on such factors as its size, its distance from the mainland, the depth and utility of the intervening waters, the shape of the island, and its relationship to the configuration or curvature of the coast." *Id.*, at 61–63, 66 (footnotes omitted; emphasis in original).

The Court also stated that an island's "origin . . . and resultant connection with the shore" is another factor to be considered. *Id.*, at 65, n. 84.

The Court reached this conclusion after surveying such case law as there was and the scholarly discussion of the question. See *id.*, at 64–66, nn. 84 and 85. That survey

suggested that there was a consensus that islands may be assimilated to the mainland, and that a common-sense approach was to be used to determine when islands may be so treated. See *id.*, at 64; 1 A. Shalowitz, Shore and Sea Boundaries 162 (1962) (hereinafter Shalowitz). We see no reason to depart from those principles, and we conclude, once again, that an island or group of islands may be considered part of the mainland if they "are so integrally related to the mainland that they are realistically parts of the 'coast' within the meaning of the Convention." *Louisiana Boundary Case*, 394 U. S., at 66. See also *Louisiana* v. *Mississippi*, 202 U. S., at 45–46. We continue to find the illustrative list of factors quoted above to be useful in determining when an island or group of islands may be so assimilated.

The United States argues, however, that the language in the *Louisiana Boundary Case* should be restrictedly interpreted so as to allow islands to be treated as headlands only in a few narrow situations: when the island is separated from the mainland by a genuine "river"; when the island is connected to the mainland by a causeway; when the island is connected to the mainland by a low-tide elevation; or when, as in the *Louisiana Boundary Case*, the shoreline is deltaic in nature. We discern no such limits. Given the variety of possible geographic configurations, we feel that the proper approach is to consider each case individually in determining whether an island should be assimilated to the mainland.[9]

Applying the "realistic approach," see the *Louisiana Boundary Case*, 394 U. S., at 63, we agree with the Special Master that Long Island, which indeed is unusual, presents the exceptional case of an island which should be treated as an extension of the mainland. In particular, its shape and its

---

[9] In the *Louisiana Boundary Case* itself, the Court felt free to consider whether the Isles Dernières, large coastal islands off Caillou Bay, which fall into none of the Government's proposed narrow exceptions, could form the headlands of a bay. 394 U. S., at 66–67, and nn. 87, 88.

relation to the corresponding coast leads us to this conclu-
sion.   The island's north shore roughly follows the south
shore of the opposite mainland, with the island's shore, how-
ever, curving slightly seaward and then back, while the
mainland has a concave shape.   As a result, the large pocket
of water in Long Island Sound is almost completely enclosed
by surrounding land.

The western end of Long Island helps form an integral part
of the familiar outline of New York Harbor.   It would be just
as unrealistic to exclude Brooklyn on Long Island from New
York's coastline as it would be to exclude the islands of the
Mississippi Delta from Louisiana's.   There is no acceptable
sense in which, for example, the East Side of Manhattan
Island, or Hunt's Point in the Bronx, could be said to be
locations on the Atlantic coast.[10]

At Throgs Neck, Long Island is about one-half mile from
the mainland.   The East River, which separates Long Island
from the mainland and from Manhattan Island, at one time
was as shallow as 15-to-18 feet, with a rapid current that
made navigation from Long Island Sound extremely hazard-
ous.[11]   When we contrast this narrow and shallow opening to

[10] See Pearcy, Geographical Aspects of the Law of the Sea, 49 Annals of
Assn. of American Geographers 9 (1959) (islands may form headlands when
they are "separated from the mainland by so little water that for all practi-
cal purposes the coast of the island is identified as that of the mainland").

[11] The Army Corps of Engineers in the 19th century deepened the East
River to 34 feet and made it more easily navigable.

The East River is unusual.   Technically, it is not a river; neither can it
be regarded as simply a tidal strait, connecting the Atlantic Ocean to Long
Island Sound.   Rather, it is part of the complex Hudson River estuary
system, affected by both tidal action and the fresh water flowing from the
Hudson River.   See Panuzio, The Hudson River Model, Symposium on
Hudson River Ecology 83, 89–91 (1966).   The geography of New York
Harbor and the lower Hudson Valley in its own way is as unique as the
geography of the Mississippi River Delta.   While it may be true, as the
Government suggests, that an island formed by the bank of a river is more
naturally considered part of the mainland than an island separated from the
mainland by something like a tidal strait, we find this general observation
of little use when evaluating the status of Long Island.

the 118-mile length of Long Island and to the extensive surface area of the bay it helps to form, we reach the conclusion that the existence of one narrow opening to the sea does not make Long Island Sound or Block Island Sound any less a bay than it otherwise would be. Both the proximity of Long Island to the mainland, the shallowness and inutility of the intervening waters as they were constituted originally, and the fact that the East River is not an opening to the sea, suggest that Long Island be treated as an extension of the mainland. Long Island and the adjacent shore also share a common geological history, formed by deposits of sediment and rocks brought from the mainland by ice sheets that retreated approximately 25,000 years ago.

Our conclusion that this area should be considered a bay is buttressed by the fact that as a result of the geographic configuration of Long Island, the enclosed water is used as one would expect a bay to be used. Ships do not pass through Block Island Sound and then Long Island Sound unless they are bound for points on Long Island or on the opposite coast or for New York Harbor. Long Island Sound is not a route of international passage, and ships headed for points south of New York do not use Long Island Sound. They pass, instead, seaward of Long Island.

The ultimate justification for treating a bay as internal waters, under the Convention and under international law, is that, due to its geographic configuration, its waters implicate the interests of the territorial sovereign to a more intimate and important extent than do the waters beyond an open coast. See generally M. McDougal & W. Burke, The Public Order of the Oceans 64, 305–309, 330–332 (1962). Our realistic approach to the question whether Long Island and Block Island Sounds constitute a bay does no more than recognize that, due to its geographic configuration, such interests are implicated here.

We reaffirm our understanding that the general rule is that islands may not normally be considered extensions of the mainland for purposes of creating the headlands of juridical

bays. Consideration of the relevant factors in this factually specific inquiry, however, leads us to agree with the Special Master that in this case Long Island functions as an extension of the mainland forming the southern headland of a juridical bay.

## V

Having concluded that Long Island Sound and Block Island Sound constitute a juridical bay, there remains the question as to where the bay ends or closes. The sections of Article 7 of the Convention having to do with the closing lines of bays, and pertinent here, are the following:

"3. For the purpose of measurement, the area of an indentation is that lying between the low-water mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points. Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths. Islands within an indentation shall be included as if they were part of the water areas of the indentation.

"4. If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters.

"5. Where the distance between the low-water marks of the natural entrance points of a bay exceeds twenty-four miles, a straight baseline of twenty-four miles shall be drawn within the bay in such a manner as to enclose the maximum area of water that is possible with a line of that length."

Article 7(2) specifies other less mathematical restrictions to be considered when determining the closing line. As previously noted, the waters in a bay must be "landlocked," and a bay must be a "well-marked indentation," which is more

than a "mere curvature of the coast." The Convention, thus, directs that the closing line be a line no more than 24 miles long connecting the natural entrance points to a well-marked indentation, and the line must enclose within the indentation landlocked waters. The closing lines may include islands if the islands cause the bay to have multiple mouths.

The Special Master agreed with the United States' present secondary position that the bay should close at the line from Montauk Point north to Watch Hill Point. The States assert that all of Block Island Sound should be within the juridical bay. They propose that the closing line be drawn from Montauk Point to a point near Southwest Point on Block Island, and from Sandy Point on Block Island to Point Judith in Rhode Island. Either proposed closing line satisfies both the 24-mile rule of Article 7 and the Article 7(2) requirement that the area enclosed be greater than that of a semicircle whose diameter is the closing line.[12] The issue therefore comes down to the proper application of the more subjective requirements of Article 7.

Were it not for the presence of Block Island, the 14-mile line from Montauk Point to Watch Hill Point clearly would be the closing line of the bay. All the parties agree that Montauk Point is one of the natural entrance points, and thus one of the end points of the bay's closing line. Watch Hill Point is nearly due north of Montauk Point. The waters west of this line are within a well-marked indentation and are landlocked under any definition of that word. They are surrounded by land on all but one side and are sheltered and isolated from the sea. The coast from Watch Hill Point eastward to Point Judith lacks any pronounced feature that might qualify as a headland. Point Judith itself is more than 24

---

[12] The distance from Montauk Point to Watch Hill Point is 14 miles. Lines connecting Montauk Point to Southwest Point, and Sandy Point to Point Judith, add up to 22 miles. Because of the extensive area of the waters enclosed by either closing line, that area is substantially greater than that of a semicircle with a diameter of either 14 or 22 miles.

miles from Montauk Point, so a straight line between those two Points cannot be considered a closing line.[13]

The Montauk-Watch Hill closing line also satisfies the relevant objective tests that have been adopted to determine the natural entrance points to a bay.[14]  It is for that reason that the Law of the Sea Task Force Committee on the Delineation of the Coastline determined that if Long Island Sound were considered a juridical bay, the Montauk-Watch Hill line would be its closing line.[15]

---

[13] In view of our ultimate disposition of this question, we express no opinion as to whether the Point Judith Harbor Works, a man-made construction lying just within 24 miles from Montauk Point, could qualify as a headland.

[14] A number of objective tests have been formulated to assist in selecting the natural entrance points to a bay.  The primary one is the 45-degree test.  It requires that two opposing mainland-headland points be selected and a closing line be drawn between them.  Another line is then drawn from each selected headland to the next landward headland on the same side.  If the resulting angle between the initially selected closing line and the line drawn to the inland headland is less than 45 degrees, a new inner headland is selected and the measurement is repeated until both mainland-headlands pass the test.  See P. Beasley, Maritime Limits and Baselines: A Guide to Their Delineation, The Hydrographic Society, Special Publication No. 2, pp. 16–17 (1977).

Witnesses before the Special Master indicated that it was through application of this test that the Montauk Point-Watch Hill Point closing line was adopted by the Baseline Committee.  See n. 15.  These objective tests are helpful in large part because they assist in defining what is finally a more subjective concept that has been described as "the apex of a salient of the coast; the point of maximum extension of a portion of the land into the water; or a point on the shore at which there is an appreciable change in direction of the general trend of the coast."  1 Shalowitz 63–64.  See also R. Hodgson & L. Alexander, Towards an Objective Analysis of Special Circumstances, Law of the Sea Institute, Occasional Paper No. 13, p. 10 (1972) (hereinafter Hodgson & Alexander) ("a point where the two dimensional character of a 'bay' . . . is replaced by that of the 'sea' or 'ocean'").  This Court previously has recognized the usefulness of objective tests in identifying entrance points.  See *United States* v. *California*, 382 U. S. 448, 451 (1966).

[15] This Committee was an interagency committee of the Federal Government, established after the Convention was adopted in 1964, to determine

The States insist, however, that the presence of Block Island gives the indentation more than one mouth as allowed by Article 7(3) of the Convention, and therefore alters the outward limits of the bay. They note that the International Law Commission's commentary on Article 7(2) of the Convention states that "the presence of islands at the mouth of an indentation tends to link it more closely to the mainland." 2 Yearbook of the International Law Commission, 1956, p. 269. The States say that this implies that where a choice of lines exists due to the presence of islands near the mouth of a bay, the line that encloses the greater area of inland water should be selected. There is support for this proposition in Article 7(5) of the Convention, which calls for a 24-mile closing line to be drawn that encloses the maximum area of water whenever the natural closing line exceeds 24 miles. There is also support for this position among the text writers.[16]

_____

the baseline around the United States and to draw closing lines where needed in conformity with the requirements of the Convention.

[16] In 1 Shalowitz 225, and n. 38, for example, it is said that it would be a reasonable extrapolation from Articles 7(3) and (5) of the Convention to allow outlying islands to form part of the end line of a bay. The author notes, however: "The rule proposed would still leave unresolved the question of how far seaward from the headland line islands could be in order to be incorporated under the rule. The best solution would be to consider each case on its merits and apply a rule of reason."

This Court faced a related problem in the *Louisiana Boundary Case*, 394 U. S., at 54–60, where it rejected the argument that the existence of islands that intersect the closing line of a bay, and thus form multiple mouths of that bay, should in no event have the effect of pulling the closing line inward. The Court noted that much as seaward islands tend to extend the contours of a bay, landward islands intersected by a mainland-to-mainland closing line have the effect of narrowing the contours of the bay if the islands create multiple mouths. *Id.*, at 58. The Court declined to address the question whether islands that are completely landward of a mainland-to-mainland closing line can form multiple mouths. *Id.*, at 58–59, and n. 79. An evaluation of the effect of landward islands is complicated by that part of Article 7(3) which states: "Islands within an indentation shall be included as if they were part of the water areas of the indentation." The Convention has no similar treatment of islands located outside an indentation.

It is the view of the United States that no island like Block Island lying outside an indentation can form multiple mouths of a bay. It claims that unless Block Island is intersected by a line which would otherwise close the bay, it cannot be used to form multiple mouths.[17]

This case presents no opportunity to resolve that dispute, for under any reasonable interpretation of the Convention, Block Island is too removed from what would otherwise be the closing line of the bay to affect that line. Block Island is nearly 12 miles from Montauk Point and 6 miles from the nearest land. At no point is it closer than 11 miles from the 14-mile line between Montauk Point and Watch Hill Point. It is an island far removed from the headlands of the juridical bay formed by Long Island.

The States appear to be arguing not that an island near the mouth of a bay creates multiple mouths, but that an island well beyond what would otherwise be the mouth of the bay can cause the bay to have an entirely different mouth. Because of the presence of Block Island, it is said, the waters landward of the island take on the appearance and uses of a bay's waters. To support their argument they note that ships entering Block Island Sound come between Block Island and Point Judith. The presence of Block Island, therefore, has the effect of making Point Judith one of the natural entrance points of the bay. And once the closing line is drawn from Montauk Point to Point Judith, Block Island is near enough to that closing line that it ought to be included as an island creating multiple mouths to the bay.

Such a treatment of islands beyond the natural entrance points of an indentation finds no support in the Convention

---

[17] The United States recognizes two other circumstances in which islands may be utilized in drawing closing lines: When an island is considered a headland to the bay, and when an island or group of islands "screen" the mouth of a bay so that they block more than half the opening. See *Louisiana Boundary Case*, 394 U. S., at 58. Block Island is clearly not a screening island, nor is it argued that it forms a headland of the bay.

or in any of the scholarly treatises. Nowhere has it been suggested that because ocean traffic headed into a bay happens to pass landward of an island in open sea in order to enter that bay, the island therefore marks an entrance point to the bay. Nor is such a theory a fair extrapolation of Articles 7(2) and (5) of the Convention.

There are also a number of substantial difficulties with that approach, not the least of which is that the line from Montauk Point to Point Judith exceeds the 24-mile limit imposed by the Convention. And, most significantly, some of the waters enclosed by the suggested closing line are not landlocked, as required by the Convention. The Convention does not define "landlocked," and this Court has not yet felt it appropriate to offer a comprehensive definition of the term.[18] Scholars interpreting the Convention have given the term a subjective and common-sense meaning. We agree with the general proposition that the term "landlocked" "implies both that there shall be land in all but one direction and also that it should be close enough at all points to provide [a seaman] with shelter from all but that one direction." P. Beasley, Maritime Limits and Baselines: A Guide to Their Delineation, The Hydrographic Society, Special Publication No. 2, p. 13 (1978).[19]

---

[18] In the *Louisiana Boundary Case* the Court recognized that the term "landlocked" is not to be literally applied, for it noted that an otherwise landlocked bay "surely would not lose that characteristic on account of an additional narrow opening to the sea." 394 U. S., at 61. Additionally, the Court suggested that a bay could be landlocked even if it is bounded on one side by a body of internal waters. See generally *id.*, at 48–53 (applying the semicircle test).

[19] "The concept of land-locked is imprecise and, as a result, may call for subjective judgments. . . . Basically, the character of the bay must lead to its being perceived as part of the land rather than of the sea. Or, conversely, the bay, in a practical sense, must be usefully sheltered and isolated from the sea. Isolation or detachment from the sea must be considered the key factor." Hodgson & Alexander 6, 8.

As the Special Master and the members of the Baseline Committee concluded, the waters in the outer reaches of Block Island Sound in any practical sense are not usefully sheltered and isolated from the sea so as to constitute a bay or bay-like formation. It was the credited testimony of witnesses that ships passing landward of Block Island, as a result, are not in the sheltered confines of what the Convention is willing to recognize as a bay. The waters eastward of the Montauk-Watch Hill line are exposed to the open sea on two sides and are not predominantly surrounded by land or sheltered from the sea. At the very least, therefore, the States' proposed closing line is defective because it includes open sea in the indentation in violation of the mandates of the Convention. Such is the nearly inevitable result, it seems to us, of a theory that would treat islands well beyond the natural entrance points of an indentation as creating multiple mouths to that indentation.

## VI

In summary, we agree with the Special Master and hold that Long Island Sound and Block Island Sound west of the line between Montauk Point on Long Island and Watch Hill Point in Rhode Island are a juridical bay under Article 7 of the Convention on the Territorial Sea and the Contiguous Zone. This juridical bay is closed by that line connecting Montauk Point and Watch Hill Point. The waters of the bay west of the closing line are internal state waters, and the waters of Block Island Sound east of that line are territorial waters and high seas.

The respective exceptions filed by the United States, the State of Rhode Island, and the State of New York are overruled. The recommendations of the Special Master are adopted and his Report is confirmed. The parties are directed promptly to submit to the Special Master a proposed appropriate decree for this Court's consideration; if the parties are unable to agree upon the form of the decree, each shall submit its proposal to the Master for his consid-

eration and recommendation. Each party shall bear its own costs; the actual expenses of the Special Master shall be borne half by the United States and half by Rhode Island and New York.

The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as from time to time may be deemed necessary or advisable to effectuate and supplement the decree and the rights of the respective parties.

*It is so ordered.*