# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 20, 2015         Decided January 5, 2016

No. 14-5304

ANGLERS CONSERVATION NETWORK, ET AL.,
APPELLANTS

v.

PENNY SUE PRITZKER, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01761)

*Roger M. Fleming* argued the cause for appellants. With him on the briefs were *Erica A. Fuller* and *Stephen E. Roady*.

*Robert J. Lundman*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the briefs were *John C. Cruden*, Assistant Attorney General, and *Brian C. Toth*, Attorney. *Thekla Hansen-Young*, Attorney, entered an appearance.

Before: BROWN, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*:

Plaintiffs brought this lawsuit claiming that federal agencies unlawfully neglected to manage stocks of river herring (alewives and blueback herring), and shad (American shad and their smaller relatives, hickory shad) in the Atlantic Ocean from New York to North Carolina.

These are schooling ocean fish. In early spring, as waters warm, river herring and shad begin their annual spawning runs into the mid-Atlantic coastal rivers and tributaries.[1] Shad, especially American shad, and more specifically the larger female American shad, are prized game fish. They are like small tarpon, some say, and are caught on shad darts (tiny lures) in the rivers even though shad feed on plankton at sea and feed not at all on their spawning runs. While migrating upstream, shad and river herring[2] are prey for bald eagles and ospreys and other birds, such as cormorants and gulls, and for striped bass making their annual spawning run from the ocean about the same time into many of the same rivers, and for other fish when they are at sea.

Plaintiffs are two membership organizations. One is dedicated to conserving wild marine fish, the other to promoting

---

[1] Historians believe that the 1778 early spring spawning run of shad in the Schuylkill River at Valley Forge saved George Washington's army from starvation. *See* JOHN MCPHEE, THE FOUNDING FISH 150-52 (2002). At Mt. Vernon, Washington had seen enormous numbers of spawning shad moving up the Potomac River toward Great Falls. Mr. McPhee plausibly surmises that, in anticipation of a similar spring run and in the hope of preserving his army, Washington decided to encamp that winter at Valley Forge on the edge of the Schuylkill River. *Id.* 151-52.

[2] The term "river" herring distinguishes these fish from the Atlantic herring, which does not spawn in freshwater.

surf fishing for striped bass and other saltwater fish. Two individuals are also plaintiffs, one a fishing boat captain on the New Jersey shore, the other a town "herring warden" responsible for ensuring fish passage during spawning runs. They sued the Secretary of the Department of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service (an agency within the Commerce Department), claiming that a decision of the Mid-Atlantic Fishery Management Council – of which more hereafter – failed to manage and protect river herring and shad, thus reducing their availability as food for other species such as striped bass. The district court granted the government's motion to dismiss the complaint on the ground that there was no basis for judicial review of the Fishery Council's decision.

In support of their complaint, plaintiffs invoked the Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331, as amended, and the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706. The 1976 Fishery Conservation Act, commonly known as the Magnuson-Stevens Act, seeks to "promote domestic commercial and recreational fishing under sound conservation and management principles," 16 U.S.C § 1801(b)(3), in the "exclusive economic zone" of the United States, an area extending 200 nautical miles seaward from each state's coastline. (Within the territorial sea, which extends three geographic miles from the coastline, the state has jurisdiction to regulate fishing, *see United States v. Maine*, 469 U.S. 504, 513 (1985).) The Act established eight regional Fishery Management Councils, each of which has "authority over a specific geographic region and is composed of members who represent the interests of the states included in that region." *C&W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991) (citing 16 U.S.C. § 1852). The voting members of these Councils are officials responsible for fishery management in

each coastal state in the region, individuals nominated by state Governors and others appointed by the Commerce Secretary, and the regional administrator of the Commerce Department's Fisheries Service. 16 U.S.C. § 1852(b). The Mid-Atlantic Council now has twenty-one voting members – seven state officials, thirteen private individuals, and the Fisheries Service regional administrator. 16 U.S.C. § 1852(a)(1)(B). The Council adopts proposals by a majority vote of those present and voting. 16 U.S.C. § 1852(e)(1).

The Mid-Atlantic Council, like all regional Councils, has no authority to promulgate federal rules. *See Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 112 n.15 (3d Cir. 2011). Under its long-time Executive Director, Daniel T. Furlong, the Mid-Atlantic Council has assisted federal authorities in seeking to accomplish the goals of the Act. The Mid-Atlantic Council has held numerous open hearings, conducted extensive research, and forwarded proposals to the National Marine Fisheries Service, to whom the Secretary delegated authority.

Under the Magnuson-Stevens Act, the Council "shall" propose fishery management plans and implementing regulations "for each fishery under its authority that requires conservation and management . . .." 16 U.S.C. § 1852(h)(1). The Council "shall" also propose amendments to these plans when "necessary from time to time," *id.*, and suggest regulations to implement these proposed amendments, 16 U.S.C. § 1853(c). After receiving a proposal from the Mid-Atlantic Council, the Fisheries Service must initiate a comment period and must then decide to accept, reject, or partially accept the proposed plan or amendment. 16 U.S.C. § 1854(a)(3). If the Fisheries Service takes no action within thirty days after the close of the comment period, the Council's proposal goes into effect "as if approved." *Id.* The Act also provides that the Commerce Secretary "may

prepare a fishery management plan" for fisheries in need of conservation if "the appropriate Council fails to develop and submit [a plan] after a reasonable period of time . . .." 16 U.S.C. § 1854(c)(1).

The controversy here deals with a proposed amendment to an existing management plan that the Fisheries Service first adopted in 1983. The plan covers mackerel, squid, and butterfish, which are managed together because they are commercially fished in the same manner, using bottom or mid-water trawls. The initial management plan, amended many times since its adoption, established yearly quotas for each of these species and limited the gear used to catch them. The management plan also acknowledged that foreign and domestic ships trawling for mackerel, squid, and butterfish inadvertently catch other fish in their nets. Among the "bycatch" in the mackerel fishery are river herring and shad. In an effort to protect river herring and shad in the exclusive economic zone, plaintiffs and others encouraged the Mid-Atlantic Council to propose amendments to add these species to the mackerel, squid, and butterfish plan and subject them to "science-based annual catch limits . . . and accountability measures . . .." Appellants' Br. 2.

The Mid-Atlantic Council has not yet taken that step. In 2012, the Council began developing Amendment 15 to the Mackerel, Squid, and Butterfish Fishery Management Plan, which would have proposed adding river herring and shad to the Plan. Notice of Initiation of Scoping Process, 77 Fed. Reg. 65,867 (Oct. 31, 2012). After considering the Amendment, the Council — in a ten-to-nine vote — decided in an October 2013 meeting that rather than approving the Amendment and proposing it to the Fisheries Service, the Council would set up

a working group to study river herring and shad in more detail and revisit the issue in three years.[3]

This decision, plaintiffs claim, violated the Magnuson-Stevens Act and is subject to judicial review under § 1855(f) of that statute and the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706. The Magnuson-Stevens Act provides for judicial review of "[r]egulations promulgated by the Secretary under this chapter and . . . actions that are taken by the Secretary under regulations which implement a fishery management plan . . .." 16 U.S.C. § 1855(f)(1)-(2). The Act incorporates, but only in part, the judicial review section of the APA: "the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of" the APA. 16 U.S.C. § 1855(f)(1)(B).[4] The Magnuson-Stevens Act thus does not incorporate § 706(1) of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed."

According to plaintiffs, the Council's decision not to propose Amendment 15 at this time is within the Magnuson-Stevens Act's provision allowing judicial review of "actions that

[3] To date, the Fisheries Service has taken no steps to add river herring and shad to the Mackerel, Squid, and Butterfish Fishery Management Plan.

[4] Section 706(2) of the APA has two additional subsections not incorporated in the Magnuson-Stevens Act – § 706(2)(E), dealing with judicial review of adjudications subject to APA §§ 556 and 557, and § 706(2)(F), dealing with trial de novo in the reviewing court. The review provision of the Magnuson-Stevens Act also expressly makes § 705 of the APA "not applicable." 16 U.S.C. § 1855(f)(1)(A). This APA provision authorizes reviewing courts to grant relief pending review. 5 U.S.C. § 705.

are taken by the Secretary under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(2). This, they say, was an "action under the regulations that define all Mid-Atlantic fisheries" because "the Secretary terminated [the] rulemaking . . .." Appellants' Br. 26. But it was the Mid-Atlantic Council, not the Secretary or the Fisheries Service, who tabled Amendment 15 pending further study. Plaintiffs' efforts to show otherwise do not survive examination.

In their complaint, plaintiffs alleged that because the regional administrator of the Fisheries Service spoke against adopting the Amendment and voted against it in the October 2013 meeting, the Council's decision could be attributed to the Fisheries Service. *See Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 435-36 (D.D.C. 2014). On appeal, plaintiffs have not repeated this argument. Instead, they assert that if a Council decides to forgo a necessary management plan or amendment, the Fisheries Service is "the party responsible for that action" because it "must fulfill its statutory responsibility as a backstop" to the Council. Appellants' Br. 30 (quoting *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 197-98 (D.D.C. 2014). But even if the Fisheries Service had such a broad, mandatory duty to act as a "backstop" – a subject we discuss later – this would at most obligate the Fisheries Service to act when the Council fails to do so. It would not somehow transform the inactions of the Council into "actions that are taken by the Secretary" or the Fisheries Service. 16 U.S.C. § 1855(f)(2). The Fisheries Service took no action subject to judicial review under the Act.

Plaintiffs cite *Flaherty v. Bryson*, 850 F. Supp. 2d 38 (D.D.C. 2012), and *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49 (D.D.C. 2014), but those decisions do not support their position. The complaints in both cases objected to amendments of fishery management plans and alleged that it was arbitrary and

capricious for the Fisheries Service not to consider including river herring and shad. *Flaherty*, 850 F. Supp. 2d at 45-46; *Oceana*, 24 F. Supp. 3d at 56-57, 60-61. In *Flaherty* and in *Oceana*, the Fisheries Service thus took federal agency action: it issued regulations amending fishery management plans. As a result, both cases were squarely within 16 U.S.C. §1855(f)(1), which makes judicial review available "within 30 days after . . . regulations are promulgated or the action is published in the Federal Register . . .." In this case, plaintiffs are not complaining about a regulation or any other action taken by the Fisheries Service. The only "action" they identify is that of the Mid-Atlantic Council.

Plaintiffs also assert a right to judicial review under § 706(2) of the Administrative Procedure Act, which allows review of "final agency action." 5 U.S.C. § 704. But this adds nothing to their case. The judicial review provision of the Magnuson-Stevens Act expressly incorporates most of APA § 706(2). For reasons already mentioned, the Mid-Atlantic Council took the only action here – putting off a final decision on Amendment 15. That action cannot be attributed either to the Secretary or to the Fisheries Service. Plaintiffs do not contend that the Council is itself a federal agency within the meaning of the APA. Besides, the Council is not a defendant in this suit, and we would therefore have no jurisdiction to review its decision. *See, e.g.*, *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); *Armstrong v. Bush*, 924 F.2d 282, 295 n.11 (D.C. Cir. 1991).

Even if the Mid-Atlantic Council were considered a division of the federal Fisheries Service, and even if the Council's decision were somehow considered "agency action," it still would not be "final agency action" as § 704 of the APA requires. Recommendations of subordinate officials are not final for purposes of judicial review, regardless whether those

recommendations might turn out to be influential. In *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992), the Supreme Court held that the Secretary of Commerce's census report to the President was not "final agency action" within the meaning of § 704. Although the President often accepted census reports without change, the President is not bound to do so and can order the Secretary to "reform the census" before the President submits it to Congress. *Id.* at 797-98. Because the Secretary's report did not "directly affect the parties" or "complete[] [the agency's] decisionmaking process," the Supreme Court determined that the report was not then subject to judicial review. *Id.* at 797. The Mid-Atlantic Council's decision regarding Amendment 15 is indistinguishable. This too was but an intermediate step toward final agency action.

Plaintiffs come closer to the nub of their grievance, though no closer to a successful claim, when they describe their complaint as aimed at agency inaction under § 706(1) of the Administrative Procedure Act. There is one rather glaring problem with this argument: the Magnuson-Stevens Act's judicial review provision states that a reviewing court "*shall only set aside*" regulations and actions "on a ground specified in" § 706(2)(A)-(D) of the APA. 16 U.S.C. § 1855(f)(1)(B) (italics added).[5] APA § 706(1) is excluded, yet this is the APA subsection giving courts the authority to "compel agency action unlawfully withheld." *Norton v. S. Utah Wilderness Alliance*,

---

[5] The judicial review provision of the Clean Air Act, which plaintiffs invoked in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 841 (1984), contained a comparable modification of the Administrative Procedure Act: "The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies." 42 U.S.C. §7607(d).

542 U.S. 55, 62 (2004). So how can § 706(1) possibly entitle plaintiffs to relief? Perhaps they believe that because the Magnuson-Stevens Act excludes § 706(1), there is – in the words of APA § 704 – "no other adequate remedy in a court" for agency inaction and so judicial review pursuant to § 706(1) must be available. We say "perhaps" because plaintiffs have not shared with us their rationale. They have not done so because the government, despite 16 U.S.C. § 1855(f)(1)(B), conceded that APA § 706(1) may provide a basis for relief in cases under the Magnuson-Stevens Act. *See Anglers*, 70 F. Supp. 3d at 436 n.10; Defendants' Reply in Support of Their Motion to Dismiss, at 18 n.7, ECF No. 29. The APA is not jurisdictional, *see Califano v. Sanders*, 430 U.S. 99, 105-06 (1977), and so we will assume *arguendo* that § 706(1) does apply.

Even so, plaintiffs are not entitled to relief. Section 706(1) permits judicial review of agency inaction, but only within strict limits. 5 U.S.C. § 706(1). Courts can compel an agency "to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64; *see also Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009). This standard reflects the common law writ of mandamus, which the APA "carried forward" in § 706(1). *Norton*, 542 U.S. at 63. Thus, § 706(1) grants judicial review only if a federal agency has a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command." *Id.* at 63-64.

Section 1854(c)(1) of the Magnuson-Stevens Act states that if "the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a fishery management plan for . . . [a] fishery [that] requires conservation and management," the Secretary "*may* prepare" such a plan. 16 U.S.C. § 1854(c) (italics added). This is a "grant of authority,"

as plaintiffs say, but it is a grant of discretionary, not mandatory, authority.[6]

"The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive . . .." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012). Ordinarily, legislation using "shall" indicates a mandatory duty while legislation using "may" grants discretion. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001). We acknowledge that matters are not always so clear cut. There are instances when "may" has been taken to mean "must" and when "shall" has been construed to mean "may." *See, e.g., Mason v. Fearson*, 50 U.S. 248, 258-59 (1850); *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011). But when a statutory provision uses both "shall" and "may," it is a fair inference that the writers intended the ordinary distinction. *See, e.g., Lopez*, 531 U.S. at 241; *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895). One section of the Magnuson-Stevens Act, the one at the center of plaintiffs' complaint, uses the word "shall" nearly fifty times and the word "may" nearly twenty. For example, if the Fisheries Service determines that a fishery is overfished, the Service "shall" notify the appropriate Council and ask it to develop a management plan. 16 U.S.C. § 1854(e)(2). If the Council does not do so

---

[6] Plaintiffs also rely on an amendment to the Magnuson-Stevens Act setting a 2011 deadline for the Service to adopt management plans for all fisheries that have not been designated as overfished. Pub. L. No. 109–479, § 104(b), 120 Stat. 3575, 3584 (2007); *see also Flaherty*, 850 F. Supp. 2d at 51-52. They argue that this deadline requires the Fisheries Service to add "all stocks in need of conservation and management," including river herring and shad, to a fishery management plan. Appellants' Br. 44. Plaintiffs never made this argument in the district court, and we therefore will not consider it. *See, e.g., Flynn v. Comm'r of Internal Revenue Serv.*, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001).

within two years, the Fisheries Service "*shall* prepare a fishery management plan . . . to stop overfishing . . .." 16 U.S.C. § 1854(e)(5) (italics added); *see also N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 n.2 (D.C. Cir. 2008). The provision with which we are concerned, on the other hand, states that the Service "*may* prepare" its own plan or amendment for a fishery that "requires conservation and management" if the Council has not done so "after a reasonable period of time." 16 U.S.C. § 1854(c) (italics added). If the "may" in § 1854(c) actually meant "shall" or "must" – if, in other words, § 1854(c) imposed a mandatory duty – § 1854(e) would be largely redundant. Any fishery that is overfished will also necessarily require conservation and management. Why impose a specific duty to make a plan for overfished fisheries if there is already a general duty to make a plan for all fisheries requiring conservation and management, including those that are overfished?

Plaintiffs also suggest that the Fisheries Service was required to identify river herring and shad as overfished stocks, and therefore had a mandatory duty under § 1854(e) to develop a fishery management plan. Appellants' Br. 49-51. But the Magnuson-Stevens Act makes clear that this duty arises only if "*the Secretary determines* . . . that a fishery is overfished . . .." 16 U.S.C. § 1854(e)(2) (italics added). Neither the Fisheries Service nor the Secretary has ever determined that river herring or shad are overfished, and the Magnuson-Stevens Act does not impose a discrete ministerial duty on them to do so.[7] *Compare Sierra Club*, 648 F.3d at 856.

---

[7] The status of river herring and shad populations is unclear. Some evidence suggests that these species are doing very well. For example, the Fisheries Service recently found that on the Atlantic coast, populations of alewives are either stable or significantly increasing. *See* Notice of a Listing Determination, 78 Fed. Reg. 48,944, 48,992 (Aug. 12, 2013). Other evidence, however, suggests

In short, plaintiffs' claims are not subject to judicial review under the Magnuson-Stevens Act or the Administrative Procedure Act.  The judgment of the district court is therefore affirmed.

*So ordered.*

---

that most stocks of river herring and shad are seriously depleted.  *See* MID-ATLANTIC FISHERY MANAGEMENT COUNCIL, AMENDMENT 14 TO THE ATLANTIC MACKEREL, SQUID, AND BUTTERFISH (MSB) FISHERY MANAGEMENT PLAN (FMP): FINAL ENVIRONMENTAL IMPACT STATEMENT 208 (2013).  The cause of this decline, if it exists, is equally uncertain.  Plaintiffs argue that fishing at sea is a substantial factor.  Appellants' Br. 12-14.  The Fisheries Service has found that "[d]ams and hydropower facilities, water quality and water withdrawals from urbanization and agricultural runoff, [and] dredging and other wetland alterations" have had a significant impact.  78 Fed. Reg. 48,953-58.  These uncertainties are among the issues the Mid-Atlantic Council decided to study further when it postponed consideration of Amendment 15.