## THE GOLMACCAM.

District Court, D. Maine, N. D.
Oct. 10, 1934.

John D. Clifford, Jr., U. S. Dist. Atty., and Edward J. Harrigan, Asst. U. S. Dist. Atty., both of Portland, Me., for the United States.

F. R. Dyer, and Nathan W. Thompson, both of Portland, Me., and H. L. Graham, of Bar Harbor, Me., for defendant.

PETERS, District Judge.

This is a libel for the forfeiture of a British vessel for the penalty incurred by her master for failure to produce a proper manifest on demand by an officer of the Coast Guard, as provided by the Tariff Act of 1930, §§ 584, 594 (46 Stat. 747, 748 and 751 [19 USCA §§ 1584, 1594]).

It is alleged that the vessel was bound for the United States, and that the seizure was within 12 miles of the coast and also within one hour's sailing distance of the coast; this latter to meet the requirements of the treaty with Great Britain which went into effect May 22, 1924.

In reaching my conclusions as to the following facts found I have considered only the evidence on the part of the government, where there is any such.

Captain Bickford, in command of a United States Customs patrol boat, left Stonington, Me., on the morning of July 12th, last, on patrol duty bound generally to a position 15 miles south of Mount Desert Rock. Reach-

ing there about noon, he changed his course and ran in a northeasterly direction until he picked up the smoke, and presently the hull, of a vessel northeast of him apparently proceeding westerly toward Mount Desert Rock, the nearest part of the coast in that vicinity; being a rocky peak just reaching the surface of the ocean, on which there is a lighthouse, about 20 miles from the island of Mount Desert. Upon the vessels approaching each other, the patrol boat signaled the other to stop, first by the siren whistle, and then, no attention being paid to that, by four shots fired across the bow, whereupon the other vessel, the Golmaccam, shut down her motor and was boarded by two customs officers from the patrol boat. These officers looked in the hatches and observed that the vessel carried what appeared to be about half or two-thirds of a cargo of liquor. The captain of the Golmaccam was then ordered to proceed to Southwest Harbor, but he refused, claiming that he was "outside the limit." A line from the patrol boat was attached to the Golmaccam, and she was towed into Bar Harbor, and there taken possession of by a Deputy Collector of Customs. After the line from the patrol boat was taken aboard the Golmaccam, her captain was asked for her papers. The manifest produced contained no detailed account of the merchandise aboard. The statutory penalties were assessed against the captain, and these proceedings followed.

At the hearing in court the claimant of the Golmaccam asked for the dismissal of the libel on the ground that the seizure was not made within the zone established by the treaty with Great Britain; that is to say, claiming that the seizure was unlawful because made "at a greater distance from the coast than can be traversed in one hour by the vessel" seized, there being no contact boats in evidence here.

That brings us to the special issues raised:

(1) What was the speed of the Golmaccam?

(2) Was the Golmaccam at the time of the seizure within one hour's steaming distance from Mount Desert Rock, the nearest "coast of the United States"?

As to the speed, there was no substantial evidence produced by the government on this point; nor does it appear that any test of the speed of the vessel has been made while in the possession of the government. The captain and another man on the patrol boat stated in the course of their testimony that at the time the boats were approaching each other the Golmaccam appeared to be going as fast or faster than the government boat, which had a standard speed of 10 knots per hour. Another of the patrol boat crew testified that the engineer of the Golmaccam said to him that she could make about 14 knots. This was denied by the engineer. In fact, the only definite evidence of the speed of the Golmaccam (other than the testimony of her captain who said that the best she could do was 10 knots) was that of the expert called by the claimant, a naval architect from Boston, a man apparently of skill and experience, who figured after careful calculations of the boat and her power equipment, weight, etc., that her maximum speed was 10½ knots.

In the absence of other evidence, I find that the Golmaccam's maximum speed was 10½ nautical miles per hour.

Was the Golmaccam within this distance from Mount Desert Rock at the time of the seizure?

The evidence on the part of the government on this point is conflicting and unsatisfactory. From it it is difficult, if not impossible, to determine the exact position of the vessel at the time in question.

The captain of the patrol boat ran by dead reckoning and at the hearing located his position upon charts introduced in evidence. The first chart used was subsequently discarded, because it developed that the captain had made certain allowances for the tide which should not have been made. On the second chart he placed his corrected courses and located a point marked E, which was the point of seizure according to his dead reckoning. He then testified that he had obtained a bearing on Cadillac Mountain from his position in the ocean about the time of seizure, and that the bearing thus obtained would not be correct for the point E on the chart, but would be correct for a point which he marked G, a mile farther to the westward. The point E is approximately 12 miles, and G 11 miles, from Mount Desert Rock.

Confidence in the accuracy of the point G is somewhat shaken when other testimony of the captain and his men is considered.

Both the captain and the engineer testified that the course taken in towing the seized vessel to Egg Rock Buoy, near Bar Harbor, was north one-half west. They also said that the top of Cadillac Mountain bore north seven-eighths west from the starting point of the tow. If both courses are correct and correctly represented by lines drawn on the chart by the captain, the point of seizure would be

some 20 miles from Mount Desert Rock, and some 13 miles south of the point G; which is quite impossible in view of all the evidence. The difficulty comes not only in obtaining an accurate sight on the mountain at a distance of 25 or 30 miles, but especially in placing the course on the chart where the location of the mountain is not shown except by some lettering in its general vicinity, which lettering occupies a space two miles long on the chart. It is obvious that such a fine bearing cannot be relied upon under the circumstances.

A taffrail log placed in the water from the Golmaccam when she started in tow registered 22.5 miles as the distance traversed to the place where the log was taken in, said by the government witnesses to be near Egg Rock. This would seem to be a fairly reliable measurement unless affected by the tide (as two witnesses on the patrol boat said it might be), if the tow did not proceed too slow at the start to properly work the log.

If the distance traversed by the vessels to Egg Rock Buoy was 22.5 miles, the starting point would be somewhere on the arc of a circle of that radius drawn with the buoy as the center. This arc intercepts the line drawn by Captain Bickford to represent his bearing on Cadillac Mountain at a point about 8 miles from Mount Desert Rock. To call this the point of seizure, however, would require the elimination of the other testimony of the captain who, after making his corrections, places himself 5 miles farther south. It also requires as a determining factor the accuracy within one-eighth of a point of the bearing on Cadillac Mountain, not only as taken by the captain from the ocean, but in his placing it upon a chart where only the general location of the mountain is intended to be indicated by the lettering referred to. The unreliability of this factor is apparent.

There is other testimony on the part of the government which results in placing the point of seizure nearer where Captain Bickford placed it by dead reckoning, the point marked E. The officers navigating the patrol boat, including the captain, stated that when the patrol boat arrived at a location found by dead reckoning to be the point marked C on the chart, the Golmaccam was northeast of them and east-southeast from Mount Desert Rock, proceeding toward it at approximately their own speed of 10 knots. The point east-southeast of Mount Desert Rock and northeast of the position of the patrol boat at C is easily placed on the chart and is 15 miles from the Rock.

At the point C the patrol boat changed her course to northeast and ran 13 minutes at standard speed, or about 2.2 miles, to a point marked D on the chart. During that time the Golmaccam had been proceeding west-north-west toward the Rock and thus came to a point about 13 miles from it, when both boats changed their courses and headed toward each other.

Assuming that they were going at approximately the same speed, the point of meeting and the point of seizure would be in the vicinity of point E or somewhat east of it.

While there seems to be no point that can be established as the point of seizure in harmony with all the evidence on the part of the government, there is no other evidence that can be sufficiently relied upon to change the point of seizure as fixed by Captain Bickford to any other definite point nearer the Rock; and I am forced to find, by a consideration of the government's evidence alone, that the seizure was not made nearer the coast than 11 nautical miles.

## Conclusions of Law.

■ The allegation that the vessel was seized within 12 miles of the coast and any evidence tending to support a seizure if made within that limit may be disregarded as it is now settled, as to British vessels, that the 12-mile limit has been superseded by the one-hour distance specified in the treaty with Great Britain. That treaty permits boarding to examine the manifest, etc., beyond the 3-mile limit, if the vessel is within one hour's sailing distance of the coast, but forbids it as to vessels not within such sailing distance, and is self-executing. Cook v. U. S., 288 U. S. 102, 53 S. Ct. 305, 77 L. Ed. 641.

The statute under which the penalty was assessed in this case is applicable only to vessels bound to the United States. It is alleged in the libel that the Golmaccam was so bound. The evidence to sustain that allegation is very meager and depends largely upon the assumption, probably correct, that her cargo was destined for American consumption. I have not made a finding on this point because it is immaterial where the vessel was bound. She must be found within the treaty zone in any event.

■ A suggestion has been made, although not pressed, that the treaty with Great Britain was abrogated by our repeal of the prohibition amendment. The point, in my opinion, has no merit in view of the fact that the large reasons for the treaty have not been wholly removed by such repeal, nor has the

machinery expressly set up for its modification or abrogation ever been made use of by the high contracting parties.

The statute provides that in suits for forfeiture of vessels, etc., seized under the provisions of the law relating to the collection of duties, where the property seized is claimed by another person, the burden of proof shall lie upon him, "Provided, That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court." USCA, title 19, § 1615.

The provisions of law relating to the manifests of inbound vessels are directly related to the collection of duties, so the above statute is applicable here.

I apprehend, however, that under the provisions of the treaty it must be shown that the vessel was taken within the established limits before the burden of proof shifts to the claimant.

Unless the vessel was in the treaty zone, there was no right to board her and ask for her manifest.

No "probable cause," which is the same as reasonable cause, can exist for the bringing of this suit unless the initial proceedings occurred within a place where the court had jurisdiction, and this must first be shown. The George and Earl (D. C.) 30 F.(2d) 441, and cases cited.

In this case the government not only fails to show that the seizure was within the treaty zone, but its evidence fairly shows the contrary; and as a consequence the libel must be dismissed.