**UNITED STATES of America, Appellee,**

v.

**Patrick QUEMENER, Yann Raymond Boedec, Steven Seward, Defendants-Appellants.**

Nos. 533, 534, 535 Docket 85–1273, 85–1284, 85–1297.

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1985.

Decided April 28, 1986.

Richard A. Reeve, New Haven, Conn. (Federal Public Defender), for defendant-appellant Yann Boedec.

James W. Lawson, Boston, Mass. (Oteri, Weinberg & Lawson, Boston, Mass., of counsel), for defendant-appellant Steven Seward.

Thomas S. Luby, Meriden, Conn., for defendant-appellant Patrick Quemener.

Jeremiah F. Donovan, Asst. U.S. Atty. (Stanley A. Twardy, Jr., U.S. Atty., for the D. of Conn., of counsel, Jon J. Russo, Law Student Intern), for appellee.

Before MANSFIELD, PIERCE and MINER, Circuit Judges.

MINER, Circuit Judge:

Patrick Quemener, Yann Boedec and Steven Seward appeal from judgments of conviction entered in the United States District Court for the District of Connecticut (Clarie, J.) following a jury trial in which they were convicted of possessing and conspiring to possess marijuana with the intention of unlawfully importing it into the United States in violation of 21 U.S.C. §§ 955a(d), 955c. Appellants contend, *in-*

*ter alia,* that Judge Clarie erred in denying their motions to suppress physical evidence and to dismiss the indictment for lack of jurisdiction. Finding no error, we affirm.

## I. BACKGROUND

On September 25, 1984, a Coast Guard patrol plane advised the Coast Guard vessel EVERGREEN that a forty-foot sailboat, later identified as the MARGIE, was heading north approximately 216 miles from the southeast tip of Nantucket Island and 236 miles from Chatham, Massachusetts. The EVERGREEN's patrol orders were to intercept vessels "heading in a general east to northeast direction, which appeared not to be fishing and were under 300 feet in length." Commander Gregory Shaw, the EVERGREEN's skipper, was suspicious of the MARGIE's northerly course, since most pleasure boats traveled down the coast toward the Caribbean in the fall. In fact, during the EVERGREEN's twelve-day patrol, no other pleasure vessels had been observed heading north except for a few boats sailing in Block Island Sound.

Commander Shaw first observed the MARGIE at about 4:15 p.m. from a distance of approximately 800 yards. He noted it to be heavily ladened and down in the bow and generally to be riding low in the water. This was unusual, since the MARGIE's bow was designed for living quarters and not for carrying heavy cargo. The MARGIE radioed the EVERGREEN, seeking technical advice concerning certain oilline engineering problems. In response to an inquiry by Shaw, appellant Seward identified himself as the MARGIE's Master. He stated that he was a British citizen and that his home port was Rhode Bay, Anguilla, in the British West Indies.[1] He also advised Shaw that his last port of call had been Tortola and that his next port of call was to be St. John's, Newfoundland.[2] Commander Shaw then inquired as to the nationality of the MARGIE's crew. Seward replied that he thought they were French, but that he had not spoken to either of them very much during the nine days they had been sailing together. When Commander Shaw asked the purpose of the voyage, Seward claimed to be transporting the boat to St. John's, Newfoundland, for a friend who owned the boat; although he was not certain, Seward though the boat had been sold and would be traveling from St. John's to Mystic, Connecticut.

Commander Shaw testified that his suspicions were aroused by the fact that Seward did not seem to know much about his crew members after making a nine-day voyage with them in a relatively small boat, that Seward was vague as to the details of the MARGIE's intended delivery, and that the MARGIE was approximately 70° off course for its claimed destination of Newfoundland.

At about 7:00 p.m. that evening, Shaw directed one of his officers, Lieutenant McPherson, to radio the MARGIE and obtain the full names, birthdates and addresses of all those aboard. When that information was provided, the EVERGREEN forwarded it to the El Paso Criminal Intelligence Center ("EPIC"). The EPIC check

1. There is no dispute that the MARGIE was properly displaying her name and hailing port and flying the British flag.

2. A communication from the EVERGREEN to the Atlantic Area Operations Commandant later that afternoon reported the MARGIE's destination as St. John's, *Canada* ; a subsequent telex and the aircraft pilot's investigation report were to a similar effect. The EVERGREEN's radio operator testified that while he remembered saying St. John's, *Newfoundland,* he nonetheless recorded it as St. John's, *Canada.* The significance of these seemingly innocuous inconsistencies lies in an understanding of Canadian geography. The area known as St. *John,* lies approximately sixty miles north of Maine's Canadian border in the Province of New Brunswick; St. *John's,* on the other hand, lies approximately 1200 miles to the east, in the Province of Newfoundland. At the suppression hearing, appellants attempted to exploit this coincidence by arguing that their announced destination was in fact St. John, New Brunswick, a Canadian destination more compatible with their actual course, and one which would militate against a finding that the MARGIE was bound for United States waters.

proved negative as to the MARGIE itself and appellants Boedec and Quemener; Seward, however, was reported to have been involved in cocaine smuggling in the Caribbean in early 1984 using a vessel similar to the MARGIE.

Later that evening, Shaw requested permission from the Atlantic Area Operations Commandant to board the MARGIE if she came within 150 miles of the Atlantic coast of the United States. The EVERGREEN continued to follow the MARGIE at a distance of between 700 and 1000 yards throughout the night. The MARGIE continued to bear closer to the mainland on a course which, according to Shaw, eventually would have put her along the Gulf of Maine. At approximately 11:40 a.m. on September 26th, the EVERGREEN received authorization from the Atlantic Area Operations Center to board the MARGIE. The boarding was accomplished without incident at approximately 12:00 noon. At that point, the MARGIE was located approximately 141.5 miles from the southeast tip of Nantucket Island, and 159 miles from Chatham, Massachusetts, the nearest mainland coastal point.

On boarding, Lieutenant McPherson detected the aroma of marijuana. As McPherson entered the cockpit, he observed a number of burlap-covered bales. A field test indicated that the bales contained marijuana. In all, 180 bales were discovered, each weighing between forty and fifty pounds. The MARGIE was then seized and its crew arrested.

A search of the vessel revealed some minimal provisions as well as a large number of navigational charts. Specifically, the MARGIE possessed detailed coastal charts for Cape Hatteras to Charlestown, Cape Canaveral to Key West, the east coasts of Florida and South Carolina, Charlestown Light to Cape Canaveral, the Leeward Islands, the West Indies, the Dominican Republic, the Virgin Islands, Jamaica, the Passage to Mona and the Gulf of Mexico and Tortola. She also possessed detailed coastal charts for Block Island Sound and eastern and mid-Long Island Sound. While there were no detailed coastal charts for any area north of Cape Cod, there were two charts showing Canadian points; one was a general chart showing St. John's, Newfoundland, but covering the immense area from Newfoundland in the north to Surinam, off South America, to the south. That chart also depicted the coasts of North and South America to the west and the coasts of Europe and Africa to the east. The second chart was also a rather general one, showing St. John, New Brunswick, covering the area between Nova Scotia to the north and Cape Hatteras, off North Carolina, to the south. Coast Guard personnel testified that these were not the type of charts that a prudent mariner would use for navigating in coastal waters, since "there is not enough definition on the charts ... to do an accurate positioning, a fixing along the beach, or to pick out the particular dangers to navigation, rocks in the water, shoal areas." A defense expert testified, however, that, in his opinion, a sailor would have been able to sail from Tortola to Canada using the charts found aboard the MARGIE.

All of this evidence was admitted at trial, in addition to certain expert navigational testimony. The government's expert testified, and the defense expert agreed, that if the MARGIE maintained the heading she was on and the speed she was making when first spotted by the Coast Guard plane, she would have reached land in the United States. The defense expert, however, also testified that if one considered instead the MARGIE's course between the first sighting by the plane and the second sighting an hour and one-half later, she was heading toward the Canadian peninsula of Nova Scotia.

## II. DISCUSSION

### A. *The Suppression Motion*

■ Appellants' principal argument on appeal is that the district court erred in denying their motion to suppress the evidence seized when the MARGIE was boarded. The predicate for this contention is severalfold. First, appellants claim that

the seizure of the MARGIE occurred more than 150 miles off the Atlantic coast of the United States, in violation of an agreement between the United States and Great Britain. The agreement provides that the British government

> will not object to the boarding by the authorities of the United States, outside the limits of the territorial sea and contiguous zone of the United States and within the areas described in paragraph 9 below, of private vessels under the British flag in any case in which those authorities reasonably believe that the vessel has on board a cargo of drugs for importation into the United States in violation of the laws of the United States.

Agreement on Narcotic Drugs: Interdiction of Vessels, Nov. 13, 1981, United States-Great Britain, T.I.A.S. No. 10296, at 2 ("USGB Agreement" or "Agreement"). Paragraph 9 of the Agreement defines the agreed upon areas to "comprise the Gulf of Mexico, the Caribbean Sea, that portion of the Atlantic Ocean West of longitude 55° West and South of latitude 30° North and all other areas within 150 miles of the Atlantic coast of the United States." *Id.* at 3.

There is no dispute that the MARGIE was seized 141.5 miles from the southeastern tip of Nantucket Island and 159 miles from Chatham, Massachusetts, the nearest mainland point. The question presented by this aspect of the appeal, therefore, is: from which point is the 150 miles limitation to be measured?

In arguing that the coast must be measured from the Massachusetts mainland, appellants rely on a substantial body of Supreme Court case law, *e.g., United States v. Maine,* 469 U.S. 504, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985); *United States v. Maine,* 452 U.S. 429, 101 S.Ct. 3074, 69 L.Ed.2d 132 (1981); *United States v. Louisiana,* 394 U.S. 1, 89 S.Ct. 768, 22 L.Ed.2d 36 (1969); *United States v. California,* 381

U.S. 139, 85 S.Ct. 1401, 14 L.Ed.2d 296 (1965), holding that a coastal state's seaward boundary generally is set as a line three geographical miles distant from its coastline. *United States v. Maine,* 105 S.Ct. at 998 (citing the Submerged Lands Act, 43 U.S.C. § 1312). "Coastline," in turn, is defined as " 'the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.' " 105 S.Ct. at 998 (quoting 43 U.S.C. § 1301(c)). According to appellants, these cases require that Nantucket be excluded in deriving the United States coast.

We find those cases inapposite however, and therefore disagree. First, as noted by the district court, these boundary cases deal exclusively with determining coastal states' ownership of the natural resources off their littoral borders vis-á-vis the federal government. Accordingly, in each of the cases, the Supreme Court purported to do no more than define the coastlines of the *states* involved; no attempt was made to fix the boundaries of the *Atlantic coast of the United States.*[3]

More important, however, while these cases focused on a definition of the term "coastline," we are concerned with the USGB Agreement's usage of the less specific "coast." A number of sources confirm the fact that "coast" denotes a far more general meaning than the term of art "coastline." *See, e.g., Mahar v. Gartland S.S. Co.,* 154 F.2d 621, 622 (2d Cir.1946) ("A country's 'coast' ordinarily means those of its borders washed by the sea ..."); Blacks Law Dictionary 232 (5th ed. 1979) ("the edge or margin of a country bounding on the sea. The term includes small islands and reefs naturally connected with the adjacent land, and rising above the surface of the water...."); Random House College Dictionary 257 (rev. ed. 1980) (the

---

**3.** In cases not involving competing claims of resource ownership between states and the federal government, lower courts have defined state boundaries to include areas embraced by a state's own territorial sea. *See Civil Aeronautics Board v. Island Airlines, Inc.,* 235 F.Supp. 990, 1007 (D.Hawaii 1964), *aff'd,* 352 F.2d 735 (9th Cir.1965); *Ex parte Marincovich,* 48 Cal.App. 474, 192 P. 156 (Cal.Dist.Ct.App.1920).

land or region next to the sea; seashore); Webster's Third New International Dictionary 433 (1981) (definition 2a: "the seashore or land near it; the margin: seaboard: the land immediately abutting the sea...."). We therefore are persuaded that the Supreme Court boundary cases cited are not dispositive with regard to a definition of the Atlantic coast.

Instead, we look to a variety of more relevant sources to support our conclusion that the MARGIE was seized within 150 miles of the Atlantic coast of the United States. First, it appears to be a widely accepted tenet of international jurisprudence that a nation's coast is considered to include, and in some cases, to be extended by, any of its territorial islands. For example, in the case of The "Anna," 165 Eng. Rep. 809 (1805), the British High Court of Admiralty determined that the capture of an American ship by a British privateer, within three miles of certain mud islands at the mouth of the Mississippi River but five miles from the mainland, was made within the territorial waters of the United States. The court wrote:

> [I]t so happens in this case, that a question arises as to what is to be deemed the shore, since there are a number of little mud islands composed of earth and trees drifted down by the river, which form a kind of portico to the mainland. It is contended that these are not to be considered as any part of the territory of America, that they are a sort of *"no man's land,"* not of consistency enough to support the purposes of life, uninhabited, and resorted to, only, for shooting and taking birds' nests. It is argued that the line of territory is to be taken only from the Balise, which is a fort raised on made land by the former Spanish possessors. I am of a different opinion; I think that the protection of territory is to be reckoned from these islands; and that they are the natural appendages of the coast on which they border, and from which indeed they are formed. Their elements are derived immediately from the territory, and on the principle of alluvium and increment, on which so much is to be found in the books of law. *Id.* at 814–15. Similar conclusions have been reached by a number of American courts. *See Ford v. United States*, 273 U.S. 593, 601, 47 S.Ct. 531, 533, 71 L.Ed. 793 (1927); *The Miss C.B.*, 63 F.2d 639, 639 (5th Cir.1933); *The Golmaccam*, 8 F.Supp. 338, 339 (D.Me.1934); *The Mazel Tov*, 51 F.2d 292, 294 (D.R.I.1931), *rev'd on other grounds*, 56 F.2d 921 (1st Cir.1932), *rev'd sub nom. Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *United States v. Henning*, 7 F.2d 488, 489 (S.D.Ala.1925), *rev'd on other grounds sub nom. Hennings v. United States*, 13 F.2d 74 (5th Cir.1926).

Of particular significance is the fact that each of these cases was decided against the backdrop of a treaty between the United States and Great Britain similar to the Agreement at issue here. *See* Convention for Prevention of Smuggling of Intoxicating Liquors, Jan. 23, 1924, United States-Great Britain, 43 Stat. 1761, T.S. No. 685. Aimed at "avoiding any difficulties which might arise between [the two nations] in connection with the laws in force in the United States on the subject of alcoholic beverages....," *id.*, Preamble, that treaty provided, in relevant part, as follows:

## ARTICLE I.

The High Contracting Parties declare that it is their firm intention to uphold the principle that 3 marine miles extending from the coastline outwards and measured from low-water mark constitute the proper limits of territorial waters.

## ARTICLE II.

(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have

imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force. When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

\* \* \* \* \* \*

(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense....

*Id. at 1761–62.*

In applying that treaty, the courts uniformly have measured the one-hour distance from the coast of any relevant offshore island. *Ford v. United States*, 273 U.S. at 600–01, 47 S.Ct. at 533 (seizure of British vessel within 12 miles of the Farallon Islands, 25 miles west of San Francisco); *The Miss C.B.*, 63 F.2d at 639 (seizure of British schooner "eight miles from the nearest land, a small island, and a further distance from the shore of the mainland"); *The Golmaccam*, 8 F.Supp. at 339 (seizure of British vessel within 12 miles of "Mount Desert Rock, the nearest part of the coast [of Maine]; being a rocky peak just reaching the surface of the ocean, on which there is a lighthouse, about 20 miles from the island of Mount Desert"); *The Mazel Tov*, 51 F.2d at 294 (British vessel seized 11–½ miles from "a small island, 'No Man's Land,' lying some distance at sea off the island of Martha's Vineyard"); *United States v. Henning*, 7 F.2d at 489 (British vessel seized "12 miles west of Sea Horse Reef beacon on the west coast of Florida and about 16 miles west of the coast of Florida; seizure upheld but based upon distance " 'from the coast of the United States, the coast of its territories, or the coast of its possessions,' " and not from the beacon).

In other contexts as well, American courts have determined the United States coast to encompass the area surrounding territorial islands. *Middleton v. United States*, 32 F.2d 239, 239–40 (5th Cir.1929) (affirming conviction for bringing aliens into the United States; defendant brought aliens into U.S. territorial waters "when he came within half a mile of the Keys, and also when he passed by the bell buoy of the Northwest Channel within three miles of an island. It does not make any difference that these islands were uninhabited; it is sufficient that they were islands of the United States."); *cf. Civil Aeronautics Board v. Island Airlines, Inc.*, 235 F.Supp. 990, 1007 (D.Hawaii 1964) (state boundaries fixed "at three nautical miles from the line of ordinary low water surrounding each and every one of the islands composing the State of Hawaii[,]" giving to Hawaii "jurisdiction over the surrounding ocean waters no greater nor less than that given to every other state of the Union bordering upon the sea"), *aff'd*, 352 F.2d 735 (9th Cir.1965); *Ex parte Marincovich*, 48 Cal.App. 474, 192 P. 156, 158 (Cal.Dist.Ct.App.1920) ("we conclude ... that ... the state [of California] has jurisdiction over a belt of water, three miles wide, around each of the islands that lie along and adjacent to our shores").

The conclusions of these courts are in accord with the vast body of other authorities. *E.g.*, H. Wheaton, *Elements of International Law* 256 (8th ed. 1866), *quoted in United States v. Louisiana*, 394 U.S. 11, 65 n. 84, 89 S.Ct. 773, 802 n. 84, 22 L.Ed.2d 44 (1969) ("[t]he term 'coasts' includes the natural appendages of the territory which arise out of the water, although these islands are not of sufficient firmness to be inhabited or forfeited...."); P. Jessup, *The Law of Territorial Waters and Maritime Jurisdiction* 456 (1927), *quoted in* 4 M. Whiteman, *Digest of International Law* 286 (1965) ("where islands, or islets not continuously submerged at low tide, are situated not more than six marine miles from, and are the property of a littoral state, the normal boundary of territorial waters is extended by including those waters lying within 3 miles of the coasts or shores of such islands or islets. For islands or islets lying further from the main-

land, a special zone is delimited around them...."); Fauchille, *Traite de Droit International Public*, pt. II, at 202 (8th ed. 1925), *cited in* Whiteman, *supra*, at 285; III Gidel, *Le Droit International Public de la Mer* 684, 717 (1934), *cited in* Whiteman, *supra*, at 285.

Moreover, a number of statements by both British and American government officials supports this precise view. For example, in a 1964 letter to Attorney General Kennedy, Secretary of State Rusk wrote:

> It is the traditional position of the United States that its territorial sea is three nautical miles in breadth measured from low water mark on its coasts. An island has its own territorial sea measured from the same baseline. It is, therefore, the Department's position that each of the islands of the Hawaiian archipelago has its own territorial sea, three miles in breadth measured from low water mark on the coast of the island....

Letter from Secretary of State Rusk to Attorney General Kennedy (May 21, 1964) (Department of State, file Av 6 US/IA), *quoted in* Whiteman, *supra*, at 281; *see also* 1 Moore, *International Law Digest* 711, 713 (1906), *quoted in* Whiteman, *supra*, at 274 (similar statement by Secretary of State Seward regarding Spain's six-mile territorial water claim in regard to Cuba). Similarly, a 1959 Department of State Bulletin authored by a Department Geographer noted that:

> Islands have their own territorial seas, which may or may not coalesce with the territorial sea of the mainland.... Islands within 6 miles of each other have territorial seas which of necessity overlap and in steppingstone fashion may extend the sovereignty of the state over distances far beyond the mainland coast. This situation is true off the coast of Massachusetts, where the territorial sea of Martha's Vineyard coalesces with that of the mainland as well as with that of Nantucket Island. As a result territorial waters extend some 30 miles seaward from the Massachusetts coast opposite Martha's Vineyard....

Pearcy, *Measurement of the U.S. Territorial Sea*, 40 Dep't St. Bull. 963, 965–66 (June 29, 1959), *quoted in* Whiteman, *supra*, at 281–82; *see also* L. Meeker, *Territorial Waters of Former Japanese Mandated Islands* (Jan. 2, 1947) (Department of State Memorandum, file 894.0145/1–247), *quoted in* Whiteman, *supra*, at 281. Finally, the report of the Special Master appointed following the decision in *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947) notes:

> The letter from the Secretary of State of November 13, 1951, says ... that at The Hague Conference of 1930 the United States took the position that each offshore island was to be surrounded by its own belt of territorial waters, and that this principle was approved in the Report of the Second Sub-Committee.... That each offshore island should have its own three-mile belt goes naturally with the fact that these islands are part of the territory of the nation to which the mainland belongs. No one, for instance, questions that the islands lying off the southern coast of California are part of the State of California, and as such each of them is, of course, entitled to its three mile marginal strip....

*Submerged Lands, 1952: Hearing on S.J. Res. 13 Before the Committee on Interior and Insular Affairs*, 83d Cong., 1st sess. 1211, 1221 (1952), *quoted in* Whiteman, *supra*, at 293–94.

The British authorities have expressed similar views. For example, in 1869, the British Law Officers sent the following instructions to the Governor of the Bahamas:

> The Cays on the north coast of Cuba ... appear to us to come within the principle laid down by Lord Stowell in the case of the *Anna* ..., and that the Spanish right of jurisdiction extends to a distance of a marine league seawards from those Cays, and over all the Banks which may be enclosed within those Cays and the Mainland of Cuba.

2 H.A. Smith, *Great Britain and the Law of Nations* 240 (1935), *quoted in* Whiteman, *supra*, at 274. Similar instructions

were offered by the British Law Officers with respect to the islands of Bermuda, 2 H.A. Smith at 232–33, *quoted in* Whiteman, *supra,* at 275, and Jamaica, 2 H.A. Smith at 239, *quoted in* Whiteman, *supra,* at 275, as well as the Great Barrier Reef at Queensland, Australia, Whiteman, *supra,* at 278–79.

Finally, this position is supported by reference to a number of international treaties. Most significant, the Convention on the Territorial Sea and the Contiguous Zone, which appellants point to as providing the source for a definition of "coastline," specifically confirms that islands possess independent coasts or coastlines. *See* Convention on the Territorial Sea and the Contiguous Zone, *done* April 29, 1958, art. 10, 15 U.S.T. 1606, T.I.A.S. No. 5639 ("1. An island is a naturally-formed area of land, surrounded by water, which is above water at high-tide. 2. The territorial Sea of an island is measured in accordance with the provisions of these articles."); *see also, e.g.,* Whiteman, *supra,* at 276–77 ("Article II of the Treaty between Great Britain and Denmark of 1902 regulating the fisheries around the Faroe Islands, stated that the Danes should enjoy exclusive fishing rights '... within the distance of 3 miles from low-water mark along the whole extent of the coast of the said islands, as well as of the dependent islets, rocks and banks.' "); *id.* at 277 ("The North Sea Convention of 1882 in article 2 stated that the fishing line should be measured from the 'low-water mark along the whole extent of the coasts of their respective countries, as well as of the dependent islands and banks.' "); *cf.* Whiteman, *supra,* at 293 ("The Report of the Second Commission (Territorial Waters) at the Hague Conference of 1930 for the Codification of International Law included the following draft of a provision ... with reference to 'Islands': 'Every island has its own territorial sea....' "); *id.* at 294 ("The text evolved by the International Law Commission with respect to islands (article 10), and contained in its 1956 and final report, ... read: 'Every island has its own territorial sea.' ").

In light of this overwhelming consensus of authority concerning the role of islands in defining a nation's coast, we have little difficulty concluding that the USGB Agreement clearly contemplates a 150 mile delimitation measured in this case from the coast of Nantucket itself. Accordingly, because the seizure of the MARGIE occurred within 150 miles of that point, we find no violation of this aspect of the two nations' Agreement.

We also conclude, as discussed more fully below, that the decision to board and seize the MARGIE was supported by a reasonable belief that the vessel had on board a cargo of drugs for importation into the United States, as required by the Agreement. Accordingly, we find no violation of the Agreement's terms and conclude that the district court properly denied appellant's motion to suppress on this basis.

■ Appellants also contend that the evidence seized on board the MARGIE should have been suppressed because the boarding of the MARGIE violated the Convention on the High Seas, *done* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962). That treaty, to which both the United States and Great Britain are parties, provides that "[s]hips shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas. *Id.* art. 6. Article 22 of the treaty provides that "[e]xcept where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her [except in certain circumstances not here applicable]." The district court found that the USGB Agreement effected a bilateral modification of the Convention and that there was, therefore, no violation of the Convention's terms. In our view, the issue of the violation *vel non* of the Convention is easily resolved without resort to a modi-

fication analysis.[4] It is clear that under articles 6 and 22, an applicable treaty may sanction and thereby legitimize conduct otherwise proscribed by the Convention. The Agreement here, providing that Great Britain will "not object to the boarding by the authorities of the United States, outside the limits of the territorial sea and contiguous zone of the United States ... of private vessels under the British flag ...," plainly brings the boarding of the MARGIE within the Convention's recognized exceptions. Accordingly, we conclude that the Coast Guard's actions did not violate the Convention on the High Seas.

In light of the foregoing, it is unnecessary to reach the issue whether appellants would have standing to seek suppression of evidence seized in violation of international treaties or agreements. *See, e.g., United States v. Green,* 671 F.2d 46, 50 (1st Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Williams,* 617 F.2d 1063, 1089–90 (5th Cir. 1980) (en banc); *United States v. Postal,* 589 F.2d 862, 873–84 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Cadena,* 585 F.2d 1252, 1259–61 (5th Cir.1978).

■ Appellants' final contention with respect to the suppression issue is that the boarding and search of the MARGIE violated their fourth amendment rights. In particular, they argue that the seizure and subsequent search of the MARGIE was not supported by probable cause. We disagree. First, we note that because the Coast Guard's stopping and boarding of the MARGIE did not amount to an arrest of the defendants, probable cause was not required. *United States v. Pinto-Mejia,* 720 F.2d 248, 262 (2d Cir.1983), *modified on other grounds,* 728 F.2d 142 (2d Cir. 1984); *United States v. Streifel,* 665 F.2d 414, 421 (2d Cir.1981). Instead, because the stopping and boarding constituted an investigatory stop, such action was proper if the Coast Guard officers were " 'aware of specific articulable facts, together with rational inferences from those facts that reasonably warrant[ed] suspicion' that the [defendants were, or were] about to be engaged in criminal activity." *Streifel,* 665 F.2d at 421 (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)). In assessing the reasonableness of a law enforcement officer's suspicions, the totality of the circumstances must be considered, *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), and "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

---

4. We nonetheless would agree with the district court's modification analysis, and reject appellants' contention that the informal exchange of letters between Great Britain and the United States was insufficient to modify the terms of a formally ratified multilateral convention. In particular, we disagree with appellants' suggestion that modification could only be effected in accordance with the express provisions of article 35 of the Convention. That article deals only with modification of the Convention in toto; that is, it sets forth the mechanism by which multilateral modification may be accomplished. It does not, however, eliminate the possibility of bilateral modification. Indeed, article 22 of the Convention proscribes the boarding of foreign merchant ships by warships *"[e]xcept where acts of interference derive from powers conferred by treaty...."* (emphasis added). We have no reason to believe that that provision does not embody treaties entered into subsequent to the effective date of the Convention. Similarly, article 6 provides that ships sailing under the flag of a state shall be subject to that state's exclusive jurisdiction *except* in cases "expressly provided for in international treaties...." Moreover, the availability of an informal mechanism for modification is confirmed by those cases holding that a nation may waive its rights under the Convention and consent to a boarding of its vessels on the high seas. *E.g., United States v. Green,* 671 F.2d 46, 50–51 (1st Cir.) (collecting cases), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982); *United States v. Williams,* 617 F.2d 1063, 1089–90 (5th Cir.1980) (en banc); *see United States v. Marsh,* 747 F.2d 7, 9 (1st Cir.1984). Certainly, if the Convention's protections may be waived by consent in any single situation, a waiver also may be found where a nation agrees in advance not to object to a specified type of boarding.

Applying those standards to the facts of this case, it is clear that the Coast Guard officers had reasonable, articulable factual grounds for suspecting that the MARGIE was engaged in smuggling drugs into the United States. First, Commander Shaw, an officer of sixteen years' Coast Guard experience, reasonably was suspicious that a pleasure craft like the MARGIE was headed north at a time of year when similar crafts almost invariably headed south. Indeed, on its September patrol, the EVERGREEN had not observed a single pleasure boat traveling north, with the exception of a few close to shore in the vicinity of Block Island Sound. Second, the MARGIE was plowing through the water, low in the bow, as if she carried a heavy cargo, an unusual phenomenon for a pleasure boat. Third, although some of the Coast Guard records reveal confusion as to the MARGIE's claimed destination, *see supra* note 2, there is no real dispute that Commander Shaw was first informed by defendant Seward that the MARGIE was headed for St. John's Newfoundland. As the district court found, the purported destination seemingly was inconsistent with the MARGIE's actual course, which would have placed her somewhere in the Gulf of Maine. Fourth, Commander Shaw was understandably suspicious that Seward was uncertain as to the identity and nationality of his crew members, particularly since the three had shared quarters on the small boat for at least nine days. Finally, the EPIC check on defendant Seward revealed that he had been involved in an attempted cocaine smuggling operation earlier in the year somewhere in the British West Indies or the British Virgin Islands.

 We have no difficulty concluding that the totality of these circumstances provided an ample basis to justify the Coast Guard's boarding. The subsequent search of the MARGIE also was justified by an additional factor which became apparent in the course of the boarding. Specifically, as the EVERGREEN approached the MARGIE, Lieutenant McPherson smelled the distinct odor of bulk marijuana. Accordingly, we hold that appellants' fourth amendment rights were not violated and that the district court correctly denied suppression on this basis.

 Having determined that the boarding complained of was supported by a reasonable and articulable suspicion, and therefore comported with the strictures of the fourth amendment, we address appellants' claim that the seizure nonetheless violated the USGB Agreement. In advancing this claim, appellants focus on the following language contained in the Agreement: "The Government of the United Kingdom of Great Britain and Northern Ireland agree that they will not object to the boarding by the authorities of the United States ... of private vessels under the British flag in any case in which those authorities *reasonably believe that the vessel has on board a cargo of drugs for importation into the United States in violation of the laws of the United States.*" (emphasis added). We need not address appellants' unsupported contention that the "reasonable belief" language embodies a greater standard than the "reasonable suspicion" standard we concluded was satisfied in this case; even were we to view the reasonable belief standard as imposing an enhanced burden on the suspicions of law enforcement officials, we would find that burden satisfied here, since it fairly may be said that the evidence available to the Coast Guard officers was sufficient to provide substantially more than reasonable suspicion.

 We also reject appellants' claim that there was insufficient evidence to support a reasonable belief that the MARGIE's cargo of marijuana was bound for the United States in violation of United States law, since we see no reason to question the correctness of the district court's factual finding that the MARGIE's apparent course would have placed her somewhere in the Gulf of Maine.

### B. *Jurisdiction*

Appellants' only other argument of substance is that the proof at trial failed to

establish an intent to enter the United States and that therefore jurisdiction over the charged offenses was lacking.

■ The statute under which appellants were convicted, 21 U.S.C. §§ 955a(d), 955c, makes it unlawful for any person to possess a controlled substance intending that it be unlawfully imported into the United States. These provisions apply to citizens of any country, acting anywhere in the world, as long as there is an intent to import the controlled substance into the United States. Indeed, the statute itself unambiguously provides that these sections are "intended to reach acts of possession ... committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 955a(h); see also Pinto-Mejia, 720 F.2d at 259. There simply is no merit to appellants' claim that their prosecution for these offenses violates international law. As we noted in Pinto-Mejia, "Congress is not bound by international law. If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law. As long as Congress has expressly indicated its intent to reach such conduct, 'a United States court would be bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment.'" Id. (quoting Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1334 (2d Cir. 1972)); see also United States v. Allen, 760 F.2d 447, 454 (2d Cir.1985).

■ Even absent that specific statutory authorization, an "intent to cause effects within the United States also makes it reasonable to apply to persons outside United States territory a statute which is not expressly extraterritorial in scope." United States v. Muench, 694 F.2d 28, 33 (2d Cir. 1982), cert. denied, 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983); see also United States v. Orozco-Prada, 732 F.2d 1076, 1088 (2d Cir.), cert. denied, — U.S. —, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984). We have no difficulty concluding that the evidence adduced at trial sufficiently established the requisite intent to import the marijuana into the United States, and thereby satisfied the nexus requirement of the objective principle of territorial jurisdiction. See Pinto-Mejia, 720 F.2d at 261 ("international law requires the state seeking to assert jurisdiction to show a nexus between it and the foreign vessel that is sufficient to justify supplanting the flag state's normally 'exclusive jurisdiction'...."); United States v. Marino-Garcia, 679 F.2d 1373, 1380–81 & n. 13 (11th Cir.1982) (objective principle satisfied by intent to cause an effect within the United States), cert. denied, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); United States v. Baker, 609 F.2d 134, 138–39 (5th Cir.1980) (same); Restatement (Second) of Foreign Relations Law of the United States § 18 comment i (1965) ("The jurisdiction of a state under the rule stated in this Section is not limited to jurisdiction to prescribe a rule punishing or redressing the conduct after it has happened. It includes jurisdiction to prescribe a rule preventing conduct which would have the effects bringing it within the rule stated in this Section.").

■ The evidence available to the jury, viewed most favorably to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), included the following: the MARGIE carried a large number of detailed coastal maps for the east coast of the United States and the Caribbean Islands, but no detailed charts for any area north of Cape Cod; although the MARGIE carried a tide table for the east coast of the United States, she had no similar table of Canadian tides; as discussed above, contrary to the MARGIE's announced St. John's, Newfoundland, course, she appeared to be heading for some spot along the United States coast. Indeed, as the EVERGREEN followed the MARGIE, the latter continued to come closer to Nantucket. The jury quite reasonably could infer a United States destination from that fact, especially since the MARGIE was low on provisions and would normally have been expected, in light of her cargo, to sail as far from the United States coast as possible. On balance, we cannot

say that the evidence was insufficient to establish the requisite intent to land the cargo in the United States. Accordingly, we reject appellants' claim that jurisdiction over the offenses was lacking.

### III. CONCLUSION

Appellants have raised a number of other claims, all of which we have examined and found to be without merit. Accordingly, the judgments of conviction are affirmed.