**SIERRA CLUB, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., et al., Defendants.**

**Civ. No. 88–0116–B.**

United States District Court, D. Maine.

March 29, 1991.

Edward F. Lawson, Weston, Patrick, Willard & Redding, Boston, Mass., John C. Page, Zuckerman, Avaunt & Devine, Gray, Me., for plaintiffs.

Michael M. Dubose, Asst. U.S. Atty., Bangor, Me., for U.S.

Thomas G. Reeves, Janet Myers, Chief Counsel, Legal Div., Me. Dept. of Transp., Augusta, Me., John Quarles, Anthony C. Roth, Leslie S. Ritts, Dept. of Transp., Washington, D.C., Me. Dept. of Transp.

Mark R. Haag, Charles J. Sheehan, Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants Marsh, Rhen, Burnley and Richardson.

HORNBY, District Judge.

What remains in this lawsuit is the plaintiffs' request that this Court suspend a

United States Coast Guard permit for the construction of a causeway to Sears Island in upper Penobscot Bay. The plaintiffs contend that the project does not comply with section 9 of The Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 401 (1988), because it does not have congressional approval. The proponent of the project, Maine Department of Transportation ("MDOT"), has intervened on behalf of the defendants.

The question is whether the Coast Guard's action in issuing the permit without congressional approval was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988). Pursuant to a November 15, 1990 conference of counsel, the parties have submitted this question on a stipulated record, *see Boston Five Cents Savings Bank v. Secretary of the Department of Housing and Urban Development*, 768 F.2d 5, 11–12 (1st Cir. 1985). The stipulated record consists of: 1) the Coast Guard Administrative Record, 2) the January 9, 1989, affidavit of Harvey J. Mitchell, 3) various Department of War materials, and 4) the relevant portions of the Stipulations and Statements of Material Facts as set out in the defendants' December 5, 1990 response to the conference of counsel.[1]

## I. PREMATURITY OF THE RIVERS AND HARBORS ACT CLAIM

During the November 15, 1990, conference of counsel, the parties discussed whether a decision on the Rivers and Harbors Act claim might be premature in light of the fact that Judge Cyr has already issued a preliminary injunction against fur-

---

**1.** The parties have stipulated that the following documents constitute the Coast Guard Administrative Record: pages 228–232 of Plaintiffs' August 11, 1988 Appendix To Motion Of [sic] Preliminary Injunction ("Plaintiffs' Appendix"), pages 332–353 of the August 26, 1988 Appendix to Memorandum of Federal Defendants—Volume 1 ("Federal Defendants' Appendix") and pages 246–247, 457–463, and 470–482 of the Au-

gust 29, 1988 Appendix to Memorandum in Support of Maine Department of Transportation's Opposition to Plaintiffs' Motion For a Preliminary Injunction ("MDOT's Appendix").

The Department of War materials are found at pages 233–236 of Plaintiffs' Appendix, page 354 of Federal Defendants' Appendix and pages 464–469 of MDOT's Appendix.

ther construction of the Sears Island project. A Supplemental Information Report ("SIR") is now being prepared and will affect the decision whether a Supplemental Environmental Impact Statement ("SEIS") must be completed under the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–70a (1988) ("NEPA"). The parties subsequently filed legal memoranda on the issue of prematurity.

■ The Sierra Club argues that NEPA proceedings will require reconsideration of the project because, with the passage of time, changing economic conditions may counsel modification or cancellation, the State of Maine may decide to invest its public funds elsewhere or the Corps of Engineers ("Corps") may change its position with respect to the causeway. (The Corps granted its own dredge and fill permit under § 404(b) of the Clean Water Act, 33 U.S.C. § 1344(b) (1988).) Since both the Corps and the Coast Guard permits are revocable, the Sierra Club argues that cancellation of the project could lead to revocation of the permits and removal of the causeway, with no need for a court to resolve the RHA issue.

These possibilities all remain speculative. "[A] case is not rendered moot simply because there is the bare possibility, or even probability, that the outcome of a separate administrative proceeding may grant the litigant identical or similar relief." *Chada v. Immigration and Naturalization Service*, 634 F.2d 408, 418 n. 6 (9th Cir.1980), *aff'd*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). There are presently no administrative actions pending before the Coast Guard or the Corps of Engineers. Only the content of the SIR/SEIS reports remains uncertain. Because the RHA claim is the only aspect of this case involving the Coast Guard, resolving this issue now will either remove the Coast Guard from the litigation entirely or enable the MDOT to seek congressional approval if that is necessary. To postpone determination of this issue until after the SIR/SEIS debate is resolved would only create further unnecessary delay. After reviewing the parties' legal memoranda on this issue, I conclude that the RHA claim is ready for decision.

## II. SIERRA CLUB'S STANDING

Judge Cyr has previously ruled that the Sierra Club (and a named plaintiff, William O'Neal) possesses article III standing to bring this suit. *Sierra Club v. Marsh*, No. 88–0116–B, slip op. (D.Me. Mar. 2, 1989). Judge Cyr found the threatened injury to aesthetic enjoyment sufficiently "palpable" to support standing, and determined that the injury was a direct result of the Defendants' actions. *Id.*

■ I now confirm Judge Cyr's earlier ruling at the preliminary injunction stage, *Sierra Club v. Marsh*, 701 F.Supp. 886, 908 (D.Me.1988), that there is no private right of action under section 9 of the RHA. *See Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1033–34 (2nd Cir.1983) (no private right of action under § 9 of the RHA based on *California v. Sierra Club*, 451 U.S. 287, 294–5, 101 S.Ct. 1775, 1779–80, 68 L.Ed.2d 101 (1981) (no private right of action under section 10 of the RHA)). I also confirm his ruling that the Sierra Club does have standing under APA section 10 because the environmental consequences of the proposed Sears Island causeway are within the zone of interests protected by section 9 of the RHA.

## III. STANDARD OF REVIEW

In September of 1982, a Coast Guard Bridge Management Specialist informed the MDOT that it had

two options relative to constructing a causeway from Kidder Pt. in Searsport, Maine to Sears Island, Maine.
1. Apply for Congressional approval as explained in COMDT INST M16590.5 Sec. G ¶ 2a pg. 3–7.
2. Include a bridge in the design, then the proposed action would be causeway approach to a bridge and they could apply for a U.S.C.G. permit.

Coast Guard Record of Contact, Plaintiffs' Appendix at 228. In April of 1983, the Coast Guard Chief, Bridge Branch, informed the MDOT Chief Engineer that a

solid fill causeway (i.e., with no bridge) "by definition requires an Act of Congress . . . for approval of construction." *Id.* at 231. But in 1985, the Chief of the Coast Guard Maritime & International Law Division concluded that "[t]he causeway to Sears Island is located in navigable waters wholly within Maine, and the state legislature may authorize construction pursuant to [section 9]," Federal Defendants' Appendix at 344—in other words, that congressional action was not necessary. The causeway permit was then issued in July of 1988, constituting final agency action.

■ Courts review agency actions under the Administrative Procedure Act with great deference, particularly those involving the interpretation of a statute the agency is charged with administering. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Environmental Protection Agency v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980). A court "need not find that [the agency] construction is

the only reasonable one, or even that it is the result [it] would have reached had the question arisen in the first instance in judicial proceedings," *American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 422, 103 S.Ct. 1921, 1932, 76 L.Ed.2d 22 (1983) (quoting *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)). To sustain the Coast Guard's action, I "need only conclude that it is *a* reasonable interpretation" of the statute. *Id.* at 423 (emphasis original). *See also Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843–845, 104 S.Ct. 2778, 2781–2783, 81 L.Ed.2d 694 (1984).

■ The Sierra Club, however, argues that I should not accord the Coast Guard's interpretation of RHA section 9 great deference in this case because its interpretation has been inconsistent and is not based upon any longstanding tradition.[2] But "[e]ven when an agency abandons a prior determination, the reviewing court should

---

**2.** Historical practice under the statute is perplexing. The 71st Congress approved three projects in arguably similar factual circumstances. Act of April 8, 1930, Pub.L. No. 71–98, 46 Stat. 147 (bridge across Flanders Bay, Maine); Act of July 3, 1930, Pub.L. No. 71–520, § 5, 46 Stat. 918, 946 (dam and dike across part of Coos Bay, Oregon); Act of February 20, 1931, Pub.L. No. 71–695, 46 Stat. 1192 (bridge across San Francisco Bay, California). The Sierra Club argues, therefore, that the RHA has been administered in the past so as to require congressional approval for structures in tidal waters. However, two of the projects (Maine and California) were actually authorized by Congress pursuant to an Act To Regulate The Construction Of Bridges Over Navigable Waters, Act of March 23, 1906, Pub.L. No. 59–65, 34 Stat. 84 (now 33 U.S.C. § 491), although RHA standards were apparently used on an administrative level in one of them. I have been unable to discover any relevant congressional or other discussion on the Coos Bay project. There is some indication that the San Francisco Bay project sought congressional approval only because it crossed Goat Island, a federal military reservation. *See* 74 Cong.Rec. 5066 (1931) (Statement of Rep. Kahn).

The Flanders Bay project in Maine has the most history, as discovered by MDOT. In December 1929, George H. Glover sought congressional approval for a bridge to be constructed across Flanders Bay from the mainland in Sorrento, Maine to Soward Island. This approval

was granted April 8, 1930, Pub.L. No. 71–98, 46 Stat. 147. MDOT's Appendix at 464. In a memorandum to the Secretary of War (the agency in charge of section 9 permits at that time), the office of the chief engineer stated:

> The navigable portion of Flanders Bay . . . lies wholly within the limits of the State of Maine, and the proposed bridge can consequently be authorized by State law and duly constructed provided the plans are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced, in conformity with the Federal Law contained in Section 9 of the River and Harbor Act of March 3, 1899. The enactment of this measure therefore appears to be unnecessary.

MDOT's Appendix at 469. The Secretary of War wrote to a Congressman representing Mr. Glover's interests and informed him that under section 9 of the RHA, "a bridge may be constructed across Flanders Bay under the State laws of Maine governing the construction of bridges. Special authority from Congress for construction of the proposed bridge is unnecessary." MDOT's Appendix at 468. According to a report by the District Engineer of the Corps of Engineers, congressional approval was nevertheless sought because Mr. Glover wished to begin construction in the Spring of 1930, and the Maine Legislature would not be in session again until 1931. *Id.* at 466.

Thus, the historical practice yields no clear conclusion.

affirm the agency's decision if the *final* agency action is not arbitrary or capricious." *Orleans Audubon Society v. Lee,* 742 F.2d 901, 907 (5th Cir.1984) (emphasis original). *See also United Technologies Corp. v. Environmental Protection Agency,* 821 F.2d 714, 723 (D.C.Cir.1987) (agency not bound to follow prior position if adequate justification for change is supplied).

I conclude that the initial interpretations of the RHA by subordinate Coast Guard officials in this case do not detract from the deference I should accord the later, more fully reasoned, response of that arm of the Coast Guard responsible for such interpretations. My conclusion is confirmed by the First Circuit's direction in 1985 in this case that the Coast Guard be given the opportunity to render an authoritative decision prior to any judicial review. *Sierra Club v. Secretary of Transportation,* 779 F.2d 776, 784 (1st Cir.1985) ("Especially here, where the threshold question concerns the intrastate or interstate character of the waterway being crossed, it is better to 'wait until the administrative agency that has special competence in this field has ruled' " (quoting *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 338, 83 S.Ct. 379, 383, 9 L.Ed.2d 350 (1963)).

## IV. MERITS OF THE RIVERS AND HARBORS ACT CLAIM

RHA section 9[3] generally requires congressional approval for the construction of a causeway "over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States." But if the causeway is to be built "across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State," the causeway can be approved by a State legislature and the U.S. Secretary of Transportation without congressional approval. This project has been approved by both the State Legislature[4] and the Secretary of Transportation acting through the Coast Guard.[5] The only question, therefore, is

3. Section 9 of the Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 401, provides:

**§ 401. Construction of bridges, causeways, dams or dikes generally; exemptions**

It shall not be lawful to construct or commence the construction of any bridge, causeway, dam, or dike over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States *until the consent of Congress to the building of such structures shall have been obtained* and until the plans for (1) the bridge or causeway shall have been submitted to and approved by the Secretary of Transportation, or (2) the dam or dike shall have been submitted to and approved by the Chief of Engineers and Secretary of the Army. *However, such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State,* provided the location and plans thereof are submitted to and approved by the Secretary of Transportation or by the Chief of Engineers and Secretary of the Army before construction is commenced. When plans for any bridge or other structure have been approved by the Secretary of Transportation or by the Chief of Engineers and Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless modification of said plans has previously been submitted to and received the approval of the Secretary of Transportation or the Chief of Engineers and the Secretary of

the Army. The approval required by this section of the location and plans or any modification of plans of any bridge or causeway does not apply to any bridge or causeway over waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce.

(emphasis supplied).

4. In an April 25, 1985 letter to the Coast Guard, the Maine Attorney General stated that it was his office's opinion that the MDOT had "been given both general and specific legislative authorization to construct a causeway from Kidder Point to Sears Island in connection with a cargo port facility on Sears Island." *See* Maine Department of Transportation's Statement of Material Facts to Which There are No Genuine Issues to be Tried, at 6. The Federal Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue, filed January 10, 1989, stated that the project has state approval, and the Sierra Club's January 19, 1989 Rule 19(b)(2) Statement Of Material Facts did not dispute this.

5. The Sierra Club has not disputed that these plans have been submitted to and approved by the Coast Guard pursuant to the authority delegated by the Secretary of Transportation at 49 C.F.R. § 1.46(c)(5) (1990).

whether the waters separating Kidder Point from Sears Island are "rivers" or "other waterways the navigable portions of which lie wholly within the limits of a single State" so that the project qualifies for that procedure.

■ To understand section 9, it is first necessary to identify the correct definition of the term "navigable" as used in the 1899 legislation. Section 9 is invoked in the first place only if there is a "navigable water of the United States." The Supreme Court defined this term (with specific reference to rivers) in *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). Rivers, the Court declared,

> constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

Thus, to be "navigable waters of the United States," waters must be so connected as to permit interstate or foreign commerce. If such waters are not involved, section 9 does not come into play. *See Hardy Salt Co. v. Southern Pacific Transportation Co.*, 501 F.2d 1156 (10th Cir.), *cert. denied*, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974) (Great Salt Lake, located entirely within Utah, is not a navigable water for purposes of RHA § 9); *National Wildlife Federation v. Alexander*, 613 F.2d 1054 (D.C.Cir.1979) (Devils Lake, located entirely within North Dakota, is not a navigable water for purposes of RHA); *Sierra Pacific Power Co. v. Federal Energy Regulatory Comm'n*, 681 F.2d 1134, 1135 (9th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1769, 76 L.Ed.2d 343 (1983) (Truckee River "not a navigable water of the United States because it lacks a navigable interstate linkage by water").

■ The waters in question are part of Penobscot Bay which, in turn, connects to the Atlantic Ocean, thereby permitting interstate or foreign commerce. Thus, they are "navigable waters of the United States." Given that section 9 is therefore applicable, the question is whether these waters fit the exception also contained in section 9 for waterways whose navigable portions are entirely within one state. In other words, are the waters of Penobscot Bay completely within the boundaries of the State of Maine? (Contrary to the Sierra Club's argument, Penobscot Bay's oceanic connection cannot alone disqualify it; without the oceanic connection, section 9 would not be applicable in the first place.) The Coast Guard determined that an arm of the sea, like a river flowing into the sea, can be wholly within a single state and that Penobscot Bay is "completely surrounded by Maine lands except where it connects to the territorial sea," Federal Defendants' Appendix at 343.

This conclusion is obviously correct, as anyone who has looked at a chart or sailed the waters of Penobscot Bay can attest. As Maine's Law Court observed in 1940:

> It is difficult to conceive of a body of water more clearly defined by nature than this, or more easily patrolled and protected by the state which controls its shores. All the islands which surround it are within the State of Maine. The mariner who passes through any of these channels almost instinctively feels himself within our domain.

*State v. Ruvido*, 137 Me. 102, 108, 15 A.2d 293, 297 (1940).[6] I conclude that the Coast

---

**6.** The Convention on the Territorial Sea and the Contiguous Zone, [1964] 15 U.S.T. (pt. 2) 1607, TIAS No. 5639, defines the term internal waters to include a "juridical bay," *i.e.*,

> a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation.

Article 7(2), and it may be that Penobscot Bay is a juridical bay and, therefore, "internal waters."

The Convention's definitions are, of course, not conclusive in determining the meaning of a statute enacted in 1899, but they do have a

Guard acted reasonably and in accordance with the law in finding that Penobscot Bay lies wholly within the limits of Maine.

■ Finally, the Sierra Club argues that the waters through which this causeway has been built are not "rivers and other waterways" under the RHA. Since no party contends that these waters are a river, the only question is whether they are "other waterways." It is difficult to see how they could not fit within this broad term. The Sierra Club's resort to various arcane canons of statutory construction to argue that "other waterways" must mean essentially the same thing as "rivers" is simply a fruitless attempt to avoid this plain and reasonable meaning. Agencies responsible for administering section 9 have traditionally given this language a broad interpretation,[7] and the legislative history yields no different conclusion.[8]

bearing on the determination whether the Coast Guard's decision is arbitrary, capricious or illegal. After all, the United States Supreme Court has used the Convention in interpreting the term "internal waters" in the Submerged Lands Act of 1953, 43 U.S.C. § 1301–1356 (1988). *See United States v. Maine*, 469 U.S. 504, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985).

Unfortunately, however, the record does not reveal whether Penobscot Bay meets the area and semi-circle calculations of the Convention's definition, although a glance at the charts suggests that it does.

The MDOT also argues that Penobscot Bay is an internal water because its mouth is 23.46 nautical miles across and the Convention defines internal waters to include bays whose mouths are less than 24 miles. It is true that under the Convention the outer boundary of the internal waters is simply measured to a point where the mouth is less than 24 miles. Therefore, if Penobscot Bay is a juridical bay, the causeway's location is in internal waters under that definition.

7. The Corps of Engineers, the agency responsible for permitting dikes and dams under section 9, has promulgated regulations that construe the "rivers and other waterways" language as referring to any "waterbodies" of the United States wholly within the limits of a single state. *See* 33 C.F.R. § 320.2(a) (1990) (state approval is sufficient if "the navigable portions of the *waterbody* lie wholly within the limits of a single state") (emphasis added); 33 C.F.R. § 321.3(c) (1990) (permit application is not complete "until the approval of the appropriate state legislature has been obtained if the navigable water of the United States is an intrastate *waterbody* (i.e., the navigable portion of the navigable water of the United States is solely within the boundaries of one state) (emphasis added)). The Corps enforced all aspects of section 9 until 1966 when some of the its duties were transferred by the Secretary of Transportation to the Coast Guard.

8. Congress passed the initial version of the Act as the Rivers and Harbors Act of 1890. Section 7 of the 1890 Act provided:

[I]t shall not be lawful hereafter to commence the construction of any bridge, bridge-draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any State, until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War ... Provided, that this section shall not apply to any bridge, bridge-draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, draw bridge, bridge piers and abutments, or other works, under an act of the legislature of any State, over or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such State.

Although this 1890 legislation was passed in response to a line of cases dealing with rivers, *e.g., Willamette Iron Bridge Co. v. Hatch*, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888), its treatment clearly extended far beyond rivers. It permitted causeways to be built across a port, road, roadstead, haven, harbor, navigable river or navigable waters wholly within the limits of a single state if they were approved by a state legislature and the Secretary of War.

In 1896, Congress directed the Secretary of War to compile the various acts relating to the protection of navigable waters and "to submit the same to Congress ... together with such recommendation as to revision, emendation, or enlargement of the said laws as, in his judgment, will be advantageous to the public interest." Act of June 3, 1896, c. 314, § 2, 29 Stat. 202, 234, *quoted in United States v. Pennsylvania Chemical Corp.*, 411 U.S. 655, 665, 93 S.Ct. 1804, 1812, 36 L.Ed.2d 567 (1973). This duty the Secretary delegated to the Chief of Engineers, and in February 1897, the Chief delivered his report to the Secretary of War. The report set out the language of section 7 of the 1890 Act as an existing law and then included the basic concept, in clearer language, as section 1 of the proposed Act. H.R.Doc. No. 293, 54th Cong.2d Sess. 4, 8 (1897). The report's proposed language ultimately became section 9 of the 1899 Act, 33 U.S.C. § 401. When questioned about the changes being made in the legislation, Senator Frye, Chairman of the Senate Rivers and Harbors Committee, responded: "There are not ten words changed in the entire thirteen sec-

For these reasons, I conclude that the Coast Guard's decision that RHA section 9 does not require congressional approval of this causeway is reasonable and entitled to deference. The issuance of the Coast Guard permit was not arbitrary, capricious, illegal or contrary to law. The Clerk shall enter judgment on the Rivers and Harbors Act claim for the defendants.

tions. It is a compilation. . . . [with] [v]ery slight changes to remove ambiguities." 32 Cong.Rec. 2297 (1899). The House Conferees presented the finished draft to the House stating that "[t]he bill as now agreed upon and presented also includes a codification of existing laws pertaining to rivers and harbors, though containing no essential changes in the existing law." 32 Cong.Rec. 2923 (1899). *See generally Hart And Miller Islands Area Environmental Group, Inc. v. Corps of Engineers,* 621 F.2d 1281, 1287–88 (4th Cir.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 544, 66 L.Ed.2d 300 (1980); *United States v. Kennebec Log Driving Co.,* 491 F.2d 562, 565 (1st Cir.1973), *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).

Thus, with these remarks, the 1890 Act's "port, road, roadstead, haven, harbor, navigable river, or navigable waters" became the 1899 Act's "rivers and other waterways." There is no suggestion in the legislative history that the scope of the exemption was being narrowed.